STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL
PROTECTION, PLAINTIFF-RESPONDENT, v. VENTRON COR-
PORATION, A MASSACHUSETTS CORPORATION; WOOD
RIDGE CHEMICAL CORPORATION, A NEVADA CORPORA-
TION AND VELSICOL CHEMICAL CORPORATION, DEFEND-
ANTS-APPELLANTS, AND ROBERT M. WOLF & RITA W.
WOLF, HIS WIFE, DEFENDANTS-RESPONDENTS, AND
UNITED STATES LIFE INSURANCE COMPANY, A NEW
YORK CORPORATION AND F.W. BERK AND COMPANY, INC.,
DEFENDANTS.

and

ROVIC CONSTRUCTION CO., INC., A CORPORATION OF THE
STATE OF NEW JERSEY, BY ITS STATUTORY RECEIVER,
JOSEPH KEANE, INTERVENOR-PLAINTIFF, v. VENTRON
CORPORATION, A MASSACHUSETTS CORPORATION; WOOD
RIDGE CHEMICAL CORPORATION, A NEVADA CORPORA-
TION; VELSICOL CHEMICAL CORPORATION AND F.W.
BERK & CO., INC., DEFENDANTS.

and

MOBIL OIL CORPORATION, CHEVRON U.S.A., INC., TEXACO, INC.
AND EXXON COMPANY, U.S.A., FOREIGN CORPORATIONS
AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW
JERSEY, PLAINTIFFS, v. STATE OF NEW JERSEY, DEPART-
MENT OF ENVIRONMENTAL PROTECTION AND STATE OF
NEW JERSEY, DEPARTMENT OF THE TREASURY, SPILL
COMPENSATION FUND, DEFENDANTS.

Argued January 10, 1983—Decided July 21, 1983.

476

478

*Harry R. Hill, Jr.,* argued the cause for appellants Ventron Corporation, etc., et al. (*Backes, Waldron & Hill,* attorneys; *Michael J. Nizolek,* on the brief).

*Adrian M. Foley, Jr.,* argued the cause for appellant Velsicol Chemical Corporation (*Connell, Foley & Geiser,* attorneys; *Adrian M. Foley, Jr.,* and *John F. Neary,* of counsel; *John F. Neary,* on the briefs).

*Murry D. Brochin* argued the cause for respondents Robert M. Wolf, et al. (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan,* attorneys; *Deanne Wilson Plank,* on the brief).

*Ronald P. Heksch,* Deputy Attorney General, argued the cause for respondent State of New Jersey, etc. (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* Assistant Attorney General, of counsel).

*Barry H. Evenchick,* Special Counsel, submitted a letter in lieu of brief on behalf of State of New Jersey, Department of the Treasury, Spill Compensation Fund.

The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the responsibility of various corporations for the cost of the cleanup and removal of mercury pollution seeping from a forty-acre tract of land into Berry's Creek, a tidal estuary of the Hackensack River that flows through the Meadowlands. The plaintiff is the State of New Jersey, Department of Environmental Protection (DEP); the primary defendants are Velsicol Chemical Corporation (Velsicol), its former subsidiary, Wood Ridge Chemical Corporation (Wood Ridge), and Ventron Corporation (Ventron), into which Wood Ridge was merged. Other defendants are F.W. Berk and Company, Inc. (Berk), which no longer exists, United States Life Insurance Company, which was dismissed by the lower courts in an unappealed judgment, and Robert M. and Rita W. Wolf (the Wolfs), who purchased part of the polluted property from Ventron.

Beneath its surface, the tract is saturated by an estimated 268 tons of toxic waste, primarily mercury. For a stretch of several thousand feet, the concentration of mercury in Berry's Creek is the highest found in fresh water sediments in the world. The waters of the creek are contaminated by the compound methyl mercury, which continues to be released as the mercury interacts with other elements. Due to depleted oxygen levels, fish no

longer inhabit Berry's Creek, but are present only when swept in by the tide and, thus, irreversibly toxified.

The contamination at Berry's Creek results from mercury processing operations carried on at the site for almost fifty years. In March, 1976, DEP filed a complaint against Ventron, Wood Ridge, Velsicol, Berk, and the Wolfs, charging them with violating the "New Jersey Water Quality Improvement Act of 1971," *N.J.S.A.* 58:10–23.1 to –23.10, and *N.J.S.A.* 23:5–28, and further, with creating or maintaining a nuisance. The defendants cross-claimed against each other; Velsicol and Ventron counterclaimed against DEP, which amended its complaint to allege the violation of the "Spill Compensation and Control Act" (Spill Act), *N.J.S.A.* 58:10–23.11 to –23.11z (repealing *N.J.S.A.* 58:10–23.1 to –23.10), enacted in 1977. The Spill Compensation Fund (Fund), created by the Spill Act to provide funds to abate toxic nuisances, *N.J.S.A.* 58:10–23.11i, intervened.

Because of issues related to the liability of the Fund, a number of its contributors (Mobil Oil Corporation; Chevron U.S.A., Inc.; Texaco, Inc.; and Exxon Company, U.S.A.) filed a complaint, later consolidated with the present action, seeking a declaratory judgment that the Spill Act not be retroactively applied to discharges of toxic wastes occurring before the effective date of the act.

After a fifty-five-day trial, the trial court determined that Berk and Wood Ridge were jointly liable for the cleanup and removal of the mercury; that Velsicol and Ventron were severally liable for half of the costs; that the Wolfs were not liable; and that, while the Spill Act liability provisions did not apply retroactively, monies from the Fund should be made available. The trial court also granted judgment in favor of the Wolfs on their cross-claim against Ventron for fraudulent nondisclosure of mercury pollution in the sale of part of the tract. That judgment included an award of costs and counsel fees incurred by the Wolfs in their defense of the DEP action. Following the entry of judgment, the trial court entered a "Procedural Order

Involving Remedy," which approved for submission to the United States Army Corps of Engineers the DEP plan for the cleanup of Berry's Creek.

The Appellate Division substantially affirmed the judgment, but modified it in several respects, including the imposition of joint and several liability on Ventron and Velsicol for all costs incurred in the cleanup and removal of the mercury pollution in Berry's Creek. 182 *N.J.Super.* 210, 224–26 (1981). Because of an amendment to the Spill Act after the trial, the Appellate Division further modified the judgment by imposing retroactive liability under the act on Wood Ridge, Velsicol, and Ventron. *Id.* at 219–22. Furthermore, the Appellate Division precluded payments from the Fund if other sources were available to pay for the cleanup, *id.* at 228, and approved the future monitoring of Berry's Creek at the expense of Velsicol and Ventron. *Id.* at 229.

We granted certification to consider the retroactive application of the Spill Act, the liability of Velsicol for the removal of mercury pollution in Berry's Creek, and the liability, including costs and counsel fees, of Ventron to the Wolfs for fraudulent non-disclosure. 91 *N.J.* 195 (1982). Thereafter we denied motions by Wood Ridge, Velsicol, and Ventron to stay the enforcement of the judgment. We modify and affirm the judgment of the Appellate Division.

I

From 1929 to 1960, first as lessee and then as owner of the entire forty-acre tract, Berk operated a mercury processing plant, dumping untreated waste material and allowing mercury-laden effluent to drain on the tract. Berk continued uninterrupted operations until 1960, at which time it sold its assets to Wood Ridge and ceased its corporate existence.

In 1960, Velsicol formed Wood Ridge as a wholly-owned subsidiary for the sole purpose of purchasing Berk's assets and operating the mercury processing plant. In 1967, Wood Ridge

subdivided the tract and declared a thirty-three-acre land dividend to Velsicol, which continued to permit Wood Ridge to dump material on the thirty-three acres. As a Velsicol subsidiary, Wood Ridge continued to operate the processing plant on the 7.1-acre tract from 1960 to 1968, when Velsicol sold Wood Ridge to Ventron.

Although Velsicol created Wood Ridge as a separate corporate entity, the trial court found that Velsicol treated it not as an independent subsidiary, but as a division. From the time of Wood Ridge's incorporation until the sale of its capital stock to Ventron, Velsicol owned 100% of the Wood Ridge stock. All directors of Wood Ridge were officers of Velsicol, and the Wood Ridge board of directors met monthly in the Velsicol offices in Chicago. At the meetings, the board not only reviewed financial statements, products development, and public relations, but also the details of the daily operations of Wood Ridge. For example, the Wood Ridge board considered in detail personnel practices, sales efforts, and production. Velsicol arranged for insurance coverage, accounting, and credit approvals for Wood Ridge. Without spelling out all the details, we find that the record amply supports the conclusion of the trial court that "Velsicol personnel, directors, and officers were constantly involved in the day-to-day operations of the business of [Wood Ridge]."

In 1968, Velsicol sold 100% of the Wood Ridge stock to Ventron, which began to consider a course of treatment for plant wastes. Until this time, the waste had been allowed to course over the land through open drainage ditches. In March 1968, Ventron engaged the firm of Metcalf & Eddy to study the effects of mercury on the land, and three months later, Ventron constructed a weir to aid in monitoring the effluent.

Ventron's action was consistent with a heightened sensitivity in the 1960's to pollution problems. Starting in the mid-1960's, DEP began testing effluent on the tract, but did not take any action against Wood Ridge. The trial court found, in fact, that

the defendants were not liable under intentional tort or negligence theories.

Nonetheless, in 1970, the contamination at Berry's Creek came to the attention of the United States Environmental Protection Agency (EPA), which conducted a test of Wood Ridge's waste water. The tests indicated that the effluent carried two to four pounds of mercury into Berry's Creek each day. Later that year, Wood Ridge installed a waste treatment system that abated, but did not altogether halt, the flow of mercury into the creek. The operations of the plant continued until 1974, at which time Wood Ridge merged into Ventron. Consistent with *N.J.S.A.* 14A:10–6(e), the certificate of ownership and merger provided that Ventron would assume the liabilities and obligations of Wood Ridge. Ventron terminated the plant operations and sold the movable operating assets to Troy Chemical Company, not a party to these proceedings.

On February 5, 1974, Wood Ridge granted to Robert Wolf, a commercial real estate developer, an option to purchase the 7.1-acre tract on which the plant was located, and on May 20, 1974, Ventron conveyed the tract to the Wolfs. The Wolfs planned to demolish the plant and construct a warehousing facility. In the course of the demolition, mercury-contaminated water was used to wet down the structures and allowed to run into the creek. The problem came to the attention of DEP, which ordered a halt to the demolition, pending adequate removal or containment of the contamination. DEP proposed a containment plan, but the Wolfs implemented another plan and proceeded with their project. DEP then instituted this action.

Although Wolf knew he was buying from a chemical company land that had been the site of a mercury processing plant, Ventron knew other material facts that it did not disclose to the Wolfs. Ventron knew that the site was a man-made mercury mine. From a study conducted by Metcalf & Eddy at Ventron's request in 1972, Ventron knew the mercury content of the soil. Although the soil and water adjacent to the plant were still

contaminated in 1974, that fact was not readily observable to the Wolfs, and Ventron intentionally failed to advise the Wolfs of the condition of the site and to provide them with the relevant part of the Metcalf & Eddy report. Based on these factual findings, the lower courts concluded that Ventron fraudulently concealed material facts from the Wolfs to their detriment. The trial court limited damages, however, to the recovery of the actual costs of the containment system on the 7.1-acre tract and other costs of abating the pollution. In affirming, the Appellate Division extended damages to include diminution in the fair market value of the premises below the purchase price because of the undisclosed mercury contamination. Both courts awarded to the Wolfs those counsel fees and costs incurred in defending the DEP action.

The trial court concluded that the entire tract and Berry's Creek are polluted and that additional mercury from the tract has reached, and may continue to reach, the creek via ground and surface waters. Every operator of the mercury processing plant contributed to the pollution; while the plant was in operation, the discharge of effluent resulted in a dangerous and hazardous mercurial content in Berry's Creek. The trial court found that from 1960–74 the dangers of mercury were becoming better known and that Berk, Wood Ridge, Velsicol, and Ventron knew of those dangers. Furthermore, the lower courts concluded that Velsicol so dominated Wood Ridge as to justify disregarding the separate entity of that corporation and imposing liability on Velsicol for the acts of Wood Ridge. Those courts also found that Ventron assumed all of Wood Ridge's liabilities in their merger. Based on those findings, the lower courts concluded that Berk, Wood Ridge, Velsicol, and Ventron were liable for damages caused by the creation of a public nuisance and the conduct of an abnormally dangerous activity. 182 N.J.Super. at 219.

The trial court also determined that the 1977 Spill Act did not impose retroactive liability for discharges of mercury into a waterway of the State. After the entry of the judgment,

however, the Legislature amended the act to impose retroactive strict liability on "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance" being removed by DEP. See *N.J.S.A.* 58:10–23.11g(c).

Exercising its original jurisdiction under *R.* 2:10–5, the Appellate Division found "overwhelming evidence of mercury pollution in the sediments and waters of Berry's Creek and its substantial and imminent threat to the environment, to marine life and to human health and safety." 182 *N.J.Super.* at 221. Consequently, the Appellate Division held Wood Ridge jointly and severally liable under the 1979 amendment to the Spill Act.

## II

The lower courts imposed strict liability on Wood Ridge under common-law principles for causing a public nuisance and for "unleashing a dangerous substance during non-natural use of the land." 182 *N.J.Super.* at 219. In imposing strict liability, those courts relied substantially on the early English decision of *Rylands v. Fletcher, L.R. 1 Ex.* 265 (1866), *aff'd, L.R. 3 H.L.* 330 (1868). An early decision of the former Supreme Court, *Marshall v. Welwood,* 38 *N.J.L.* 339 (Sup.Ct.1876), however, rejected *Rylands v. Fletcher. But see City of Bridgeton v. B.P. Oil, Inc.,* 146 *N.J.Super.* 169, 179 (Law Div.1976) (landowner is liable under *Rylands* for an oil spill).

Twenty-one years ago, without referring to either *Marshall v. Welwood* or *Rylands v. Fletcher,* this Court adopted the proposition that "an ultrahazardous activity which introduces an unusual danger into the community . . . should pay its own way in the event it actually causes damage to others." *Berg v. Reaction Motors Div., Thiokol Chem. Corp.,* 37 *N.J.* 396, 410 (1962). Dean Prosser views *Berg* as accepting a statement of principle derived from *Rylands.* W. Prosser, *Law of Torts* § 78 at 509 & n. 7 (4th ed. 1971).

In imposing liability on a landowner for an ultrahazardous activity, *Berg* adopted the test of the *Restatement of the Law of*

*Torts* (1938). See *id.,* §§ 519–20. Since *Berg,* the *Restatement (Second) of the Law of Torts* (1977) has replaced the "ultrahazardous" standard with one predicated on whether the activity is "abnormally dangerous." Imposition of liability on a landowner for "abnormally dangerous" activities incorporates, in effect, the *Rylands* test. *Restatement (Second)* § 520, comments (d) & (e).

We believe it is time to recognize expressly that the law of liability has evolved so that a landowner is strictly liable to others for harm caused by toxic wastes that are stored on his property and flow onto the property of others. Therefore, we overrule *Marshall v. Welwood* and adopt the principle of liability originally declared in *Rylands v. Fletcher.* The net result is that those who use, or permit others to use, land for the conduct of abnormally dangerous activities are strictly liable for resultant damages. Comprehension of the relevant legal principles, however, requires a more complete explanation of their development.

Even in its nascent stages, the English common law recognized the need to provide a system for redressing unlawful interference with a landowner's right to the possession and quiet enjoyment of his land. *See* 2 W. Blackstone, Commentaries *218; 1 F. Harper & F. James, *The Law of Torts,* § 1.23 (1956); 2 F. Pollock and F. Maitland, *The History of English Law* 53 (1895). Trespass and nuisance developed as the causes of action available to a landowner complaining of an unauthorized intrusion on his lands. *See* Prosser, *supra,* §§ 13, 86; P. Keeton, "Trespass, Nuisance, and Strict Liability," 59 *Colum.L.Rev.* 457 (1959); Note, "The *Rylands v. Fletcher* Doctrine in America: Abnormally Dangerous, Ultrahazardous, or Absolute Nuisance," 1978 *Ariz.St.L.J.* 99, 123. In their early forms, predating the development of negligence as a basis for liability, neither trespass nor nuisance required a showing of fault as a prerequisite to liability. *See* Keeton, *supra,* at 462–65; Prosser, *supra,* § 13, at pp. 63–64. Historically, any actual invasion that was the direct result of the defendant's act and that interfered with the

plaintiff's exclusive possession of his land constituted an actionable trespass, even in the absence of fault. Keeton, *supra,* at 464–65; *see* 1 Harper & James, *supra,* §§ 1.2–1.3. In contrast, nuisance required only an interference with the enjoyment and possession of land caused "by things erected, made, or done, not on the soil possessed by the complainant but on neighboring soil." 2 Pollock & Maitland, *supra,* at 53; *see* W. Seavey, "Nuisance; Contributory Negligence and Other Mysteries," 65 *Harv.L.Rev.* 984 (1952); Prosser, *supra,* § 86, at 571–74. The continuing nature of the interference was the essence of the harm, and as with trespass, fault was largely irrelevant. *See* Prosser, *supra,* at 576.

Such was the state of the common law in England when, in 1868, the English courts decided *Rylands v. Fletcher.* In that case, defendants, mill owners in a coal-mining region, constructed a reservoir on their property. Unknown to them, the land below the reservoir was riddled with the passages and filled shafts of an abandoned coal mine. The waters of the reservoir broke through the old mine shafts and surged through the passages into the working mine of the plaintiff. *Id.* As Dean Prosser explains, the courts were presented with an unusual situation: "[n]o trespass could be found, since the flooding was not direct or immediate; nor any nuisance, as the term was then understood, since there was nothing offensive to the senses and the damage was not continuing or recurring." Prosser, *supra,* § 78, at p. 505.

The Exchequer Chamber, however, held the mill owners liable, relying on the existing rule of strict liability for damage done by trespassing cattle. The rationale was stated:

> We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it at his peril, and if he does not do so, is *prima facie* answerable for all damage which is the natural consequence of its escape. [*Rylands v. Fletcher, L.R. 1 Ex.* 265, 279–80 (1866), *aff'd, L.R. 3 H.L.* 330 (1868)].

On appeal, the House of Lords limited the applicability of this strict liability rule to "nonnatural" uses of land. Consequently,

if an accumulation of water had occurred naturally, or had been created incident to a use of the land for "any purpose for which it might in the ordinary course of enjoyment of land be used," strict liability would not be imposed. *Rylands v. Fletcher, L.R. 3 H.L.* 330, 338–39.

Early decisions of this State recognized the doctrine of nuisance as a basis for imposing liability for damages. *See, e.g., Cuff v. Newark & N.Y. R. Co.,* 35 *N.J.L.* 17, 22 (1870) (when the owner of land undertakes to do work that is, in the ordinary mode of doing it, a nuisance, he is liable for any injuries to third persons, even when an independent contractor is employed to do the work). The former New Jersey Supreme Court, however, became one of the first courts to reject the doctrine of *Rylands v. Fletcher.* See *Marshall v. Welwood,* 38 *N.J.L.* 339 (1876). That Court reached this result by referring to the Exchequer Chamber's broad formulation of the rule, which extended liability to anything on the land "likely to cause mischief," rather than the narrowed version affirmed by the House of Lords, which limited liability to "nonnatural" use of the land. Writing for the Court, Chief Justice Beasley refused to adopt *Rylands* because it did not require the challenged activity to be a nuisance *per se.* Using the example of an alkalai works, however, he distinguished those situations in which the causes of injury partake "largely of the character of nuisances," even when they "had been erected upon the best scientific principles." *Marshall v. Welwood,* 38 *N.J.L.* at 342–43; *see also Ackerman v. Ellis,* 81 *N.J.L.* 1 (Sup.Ct.1911) (trees whose branches overhang the premises of another are an actionable nuisance).

The confusion occasioned by the rejection of the *Rylands* principle of liability and the continuing adherence to the imposition of liability for a "nuisance" led to divergent results. *See Majestic Realty Assocs., Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 433–35 (1959); *see also McAndrews v. Collerd,* 42 *N.J.L.* 189 (1880) (storing explosives in Jersey City is a nuisance *per se,* and one who stores them is liable for all actual "injuries caused thereby"). In *Majestic Realty,* this Court abandoned the term

"nuisance *per se,*" 30 *N.J.* at 434–35, and adopted a rule of liability that distinguished between an "ultrahazardous" activity, for which liability is absolute, and an "inherently dangerous" activity, for which liability depends upon proof of negligence. *Id.* at 436. In making that distinction, the Court implicitly adopted the rule of landowner liability advocated by section 519 of the original *Restatement of Torts, supra.*

This rule, while somewhat reducing the confusion that permeated the law of nuisance, presented the further difficulty of determining whether an activity is "ultrahazardous" or "inherently dangerous." *See, e.g., Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,* 32 *N.J.* 55 (1960) (discussing in *dicta* whether aviation should be considered an ultrahazardous activity). Subsequently, in *Berg,* this Court confirmed strict liability of landowners by noting that it was "primarily concerned with the underlying considerations of reasonableness, fairness and morality rather than with the formulary labels to be attached to the plaintiffs' causes of action or the legalistic classifications in which they are to be placed." 37 *N.J.* at 405.

More recently, the *Restatement (Second) of Torts* reformulated the standard of landowner liability, substituting "abnormally dangerous" for "ultrahazardous" and providing a list of elements to consider in applying the new standard. *Id.,* §§ 519–20. As noted, this standard incorporates the theory developed in *Rylands v. Fletcher.* Under the *Restatement* analysis, whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration. As set forth in the *Restatement:*

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
>
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

[*Restatement (Second) of Torts* § 520 (1977)].

Pollution from toxic wastes that seeps onto the land of others and into streams necessarily harms the environment. See Special Report to Congress, *Injuries and Damages from Hazardous Wastes—Analysis and Improvement of Legal Remedies in Compliance with section 301(e) of the Comprehensive Environmental Response Compensation and Liability Act of 1980 By the "Superfund Section 301(c) Study Group"* (reprinted as Comm. Print for the Senate Comm. on Envtl. & Pub. Works, Serial No. 97–12, 97th Cong., 2d Sess., 1982) [hereinafter cited as *Special Report*]. Determination of the magnitude of the damage includes recognition that the disposal of toxic waste may cause a variety of harms, including ground water contamination via leachate, surface water contamination via runoff or overflow, and poison via the food chain. *Special Report, supra,* at 27. The lower courts found that each of those hazards was present as a result of the contamination of the entire tract. 182 *N.J.Super.* at 217–18. Further, as was the case here, the waste dumped may react synergistically with elements in the environment, or other waste elements, to form an even more toxic compound. *See* W. Stopford & L.J. Goldwater, "Methylmercury in the Environment, A Review of Current Understanding," 12 *Envtl. Health Persp.* 115–18 (1975). With respect to the ability to eliminate the risks involved in disposing of hazardous wastes by the exercise of reasonable care, no safe way exists to dispose of mercury by simply dumping it onto land or into water.

█ The disposal of mercury is particularly inappropriate in the Hackensack Meadowlands, an environmentally sensitive area where the arterial waterways will disperse the pollution through the entire ecosystem. Finally, the dumping of untreated hazardous waste is a critical societal problem in New Jersey, which the Environmental Protection Agency estimates is the source of more hazardous waste than any other state. J. Zazzali and F. Grad, "Hazardous Wastes: New Rights and Remedies?," 13

*Seton Hall L.Rev.* 446, 449 n. 12 (1983). From the foregoing, we conclude that mercury and other toxic wastes are "abnormally dangerous," and the disposal of them, past or present, is an abnormally dangerous activity. We recognize that one engaged in the disposing of toxic waste may be performing an activity that is of some use to society. Nonetheless, "the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it." *Restatement (Second), supra,* comment h at 39.

■ The Spill Act expressly provides that its remedies are in addition to existing common-law or statutory remedies. *N.J. S.A.* 58:10–23.11v. Our examination leads to the conclusion, consistent with that of the lower courts, that defendants have violated long-standing common-law principles of landowner liability. Wood Ridge and Berk were at all times engaged in an abnormally dangerous activity—dumping toxic mercury. Ventron remains liable because it expressly assumed the liability of Wood Ridge in the merger. After 1967, Velsicol, as an adjacent landowner, permitted Wood Ridge to dump mercury onto its land. That activity has poisoned the land and Berry's Creek. Even if they did not intend to pollute or adhered to the standards of the time, all of these parties remain liable. Those who poison the land must pay for its cure.

■ We approve the trial court's finding that Berk, Wood Ridge, Velsicol, and Ventron are liable under common-law principles for the abatement of the resulting nuisance and damage. The courts below found that the Wolfs are not liable for the costs of cleanup and containment. See 182 *N.J.Super.* at 227. DEP did not petition for certification on that issue, and we do not consider it on this appeal. Berk and Wood Ridge, not Mr. and Mrs. Wolf, polluted the environment. During their ownership, the Wolfs have not continued to dump mercury and they have been responsible for only a minimal aggravation of the underlying hazardous condition.

## III

■ In this case, we need not impose liability solely on common-law principles of nuisance or strict liability. In a 1979 amendment to the Spill Act, the Legislature imposed strict liability on any person "who has discharged a hazardous substance or is in any way responsible for any hazardous substance" removed by DEP. *N.J.S.A.* 58:10–23.11g(c). That statute is consistent with the long-standing principle that the Legislature may prohibit activities that constitute a nuisance. *See Mayor of Alpine v. Brewster,* 7 *N.J.* 42, 49–50 (1957). At all times pertinent to this decision, New Jersey statutes have regulated or prohibited activities leading to pollution of the State's waters.

One of the earliest antipollution statutes was "An Act to secure the purity of the public supplies of potable waters in this State," enacted in 1899. *L.*1899, *c.* 41, *p.* 73. This provision made punishable the discharge, whether directly into state waters, or onto the ice or the banks of any watercourse or tributary thereof, of any "sewage, drainage, domestic or factory refuse, excremental or other polluting matter of any kind whatsoever which, either by itself or in connection with other matter" was capable of impairing the quality of water that might find its way into the water supply of any municipality. *Id.*

The Legislature supplemented this protection in 1937, by enacting a much broader provision, now codified at *N.J.S.A.* 23:5–28:

> No person shall allow any dyestuff, coal tar, sawdust, tanbark, lime, refuse from gas houses, or other deleterious or poisonous substance to be turned into or allowed to run into any of the waters of this state in quantities destructive of life or disturbing the habits of the fish inhabiting the same, under penalty of two hundred dollars for each offense. [*N.J.S.A.* 23:5–28, *L.*1937, *c.* 64, § 2, *p.* 176].

The 1937 act imposed strict liability on anyone who allowed a pollutant to escape into the waters of the State. *State v. Kinsley,* 103 *N.J.Super.* 190, 192–94 (Law Div.1968), *aff'd,* 105 *N.J.Super.* 347 (App.Div.1969) (landfill operator held liable under the statute, even in the absence of "guilty knowledge," because the landfill polluted streams); *see Lansco, Inc. v. De-*

*partment of Envtl. Protection,* 138 *N.J.Super.* 275 (Ch.Div.1975) (insurer held liable under comprehensive liability policy covering "all sums which the insured shall become legally obligated to pay as damages . . ." because insured, the owner of a tank farm, was strictly liable under statute for cleaning up oil spill even if the spill was caused by a third party). *But see State v. American Alkyd Indus., Inc.,* 32 *N.J.Super.* 150, 153 (Cty.Ct.1954) (defendant was not liable under statute when, contrary to instructions, watchman left his post and allowed fuel oil to flow into Berry's Creek).

■ This statute remained in substantially the same form through 1968—thus spanning the majority of the period during which Berk operated its mercury processing plant, and the entirety of the period during which Wood Ridge ran it as a Velsicol subsidiary.[1] We agree with the trial court's finding that both Berk and Wood Ridge violated the statute by intentionally permitting mercury-laden effluent to escape onto the land surrounding Berry's Creek.

In 1968, the Legislature amended *N.J.S.A.* 23:5–28 so that it read in pertinent part

> No person shall put or place into, turn into, drain into, or place where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any deleterious destructive or poisonous substances of any kind . . . . In case of pollution of said waters by substances known to be injurious to fish, birds or mammals, it shall not be necessary to show that the substances have actually caused the death of any of these organisms. [*L.*1968, *c.* 329, *p.* 979–80].

---

[1] During this time, the Legislature amended the act once, in 1950. It then read:

> No person shall allow any dyestuff, coal tar, sawdust, tanbark, lime, refuse from gas houses, oil tanks or vessels, vitriol or any of the compounds thereof, or other deleterious or poisonous substance to be turned into or allowed to run into any of the fresh or tidal waters within the jurisdiction of this State in quantities destructive of life or disturbing of the habits of the fish or birds inhabiting the same, under a penalty of five hundred dollars ($500.00) for the first offense, and one thousand dollars ($1000.00) for any subsequent offense. [*N.J.S.A.* 23:5–28, as amended, *L.* 1950, *c.* 49, § 1, *p.* 88].

A 1971 amendment, which is still in effect, added petroleum products, debris, and other hazardous substances of any kind to the list of prohibited substances; it also eliminated the necessity of showing harm to living organisms as a prerequisite to application of the statute. *L.*1971, *c.* 173, *p.* 663, § 11. Ample evidence supports the trial court's conclusion that, while operating the plant as a Ventron subsidiary from 1968–74, Wood Ridge violated this version of the statute.

The 1971 amendment to *N.J.S.A.* 23:5–28 was a part of the Water Quality Improvement Act of 1971, *N.J.S.A.* 58:10–23.1 to –23.10 (*L.*1971, *c.* 173, *pp.* 660–63, §§ 1–10), which required any person "responsible" for discharging, whether intentionally or by accident, petroleum and hazardous substances to undertake immediate removal of those substances, or to bear the expense of removal authorized by the Department of Environmental Protection (DEP). *N.J.S.A.* 58:10–23.3, –23.5, –23.7. Only discharges caused by acts of war or acts of God did not occasion strict liability, and even under those circumstances, the person responsible for the substance discharge was obligated to mitigate damages to the extent practicable. *N.J.S.A.* 58:10–23.10.

"Hazardous substances" were defined quite broadly under the Water Quality Improvement Act to include

elements and compounds which, when discharged in any quantity into, upon, or in any manner which allows flow and runoff into the waters of this State or adjoining shorelines, presents a serious danger to the public health or welfare, including but not limited to, damage to the environment, fish, shellfish wildlife, vegetation, shorelines, stream banks, and beaches. [*N.J.S.A.* 58:10–23.3(b)].

By discharging mercury-contaminated effluent from the plant onto the adjacent thirty acres and into Berry's Creek, Wood Ridge violated the act from the time of its enactment in 1971 until Wood Ridge merged into Ventron and ceased operations in 1974.

The Legislature, in 1976, enacted the Spill Compensation and Control Act of 1977 (Spill Act), *N.J.S.A.* 58:10–23.11 to –23.11z, as amended, *L.*1977, *c.* 346, § 4. The Spill Act, which is quite comprehensive in its scope, repealed and supplanted the Water

Quality Improvement Act. *L.*1976, *c.* 141, § 28. As a result, the State amended its complaint, originally filed in 1976, to allege liability under the Spill Act.

In the Spill Act, the Legislature declared the storage and transfer of hazardous substances to be a hazardous undertaking, constituting a threat to both the environment and economy of the State. *N.J.S.A.* 58:10–23.11a. The Legislature intended

to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the 'prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharge.' [*N.J.S.A.* 58:10–23.11a].

As most recently amended, the Spill Act provides that "[t]he discharge of hazardous substances is prohibited." *N.J.S.A.* 58:10–23.11c.

A discharge is statutorily defined as

... any intentional or unintentional action or omission resulting in the release, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters of the State or onto lands from which it might flow or drain into said waters outside the jurisdiction of the State. [*N.J.S.A.* 58:10–23.-11b(h)].

Further, as a result of a 1979 amendment, the Spill Act expressly applies to a discharge of a hazardous substance that occurred prior to May 1, 1977, the effective date of the act, "if such discharge poses a substantial risk of imminent damage to the public health or safety or imminent and severe damage to the environment." *N.J.S.A.* 58:10–23.11f(b)(3) (as amended, *L.*1979, *c.* 346, § 4; *L.*1981, *c.* 25, § 1).

Not only has the Legislature granted DEP the power to clean up preexisting spills, but it has also established retroactive strict liability:

Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to subsection b. of section 7 of this act shall be strictly liable, jointly and severally without regard to fault, for all cleanup and removal costs. [*N.J.S.A.* 58:10–23.11g(c), as amended, *L.*1976, *c.* 141, § 8].

■ As previously mentioned, the 1979 amendment of the Spill Act became effective subsequent to the judgment of the

trial court. Under the "time of decision rule," when legislation affecting a cause is amended while a matter is on appeal, an appellate court should apply the statute in effect at the time of its decision. *In re Petition of South Lakewood Water Co.*, 61 *N.J.* 230, 248 (1972); *see Kruvant v. Mayor of Cedar Grove*, 82 *N.J.* 435, 440 (1980). An exception to that rule obtains if the facts change substantially during the pendency of the appeal. 61 *N.J.* at 248. Here, however, defendants have not made any showing of additional evidence to support such a change.

■ In an appropriate exercise of its original jurisdiction under *R.* 2:10–5, the Appellate Division found that the record overwhelmingly supported the conclusion that the mercury pollution in Berry's Creek and the surrounding area presented a substantial and imminent threat to the environment, thus satisfying the requirement for a retroactive application of the act. Our independent analysis leads us to the same conclusion. Thus, we find Berk, Wood Ridge, and Velsicol liable under the Spill Act. Ventron is liable because it expressly assumed the liabilities of Wood Ridge in their merger.

■ When considering whether a statute should be applied prospectively or retroactively, our quest is to ascertain the intention of the Legislature. In the absence of an express declaration to the contrary, that search may lead to the conclusion that a statute should be given only prospective effect. *Rothman v. Rothman*, 65 *N.J.* 219, 224 (1974). Conversely, when the Legislature has clearly indicated that a statute should be given retroactive effect, the courts will give it that effect unless it will violate the constitution or result in a manifest injustice. *Baldwin v. Newark*, 38 *N.J.L.* 158, 159 (Sup.Ct.1895); *see Gibbons v. Gibbons*, 86 *N.J.* 515, 522–23 (1981); *Howard Savings Inst. v. Kielb*, 38 *N.J.* 186, 193 (1962). As noted, the Legislature has expressly declared that the Spill Act should be given retroactive effect.

■ Retroactivity need not render a statute unconstitutional, *Rothman v. Rothman*, 65 *N.J.* at 225, and the Spill Act, not being a criminal provision, is not invalid as an *ex post facto*

law. Furthermore, the due process clause generally does not prohibit retroactive civil legislation unless the consequences are particularly harsh and oppressive. *United States Trust Co. v. New Jersey,* 431 *U.S.* 1, 19 n. 13, 97 *S.Ct.* 1505, 1516 n. 13, 52 *L.Ed.*2d 92, 106 n. 13 (1977). In the exercise of the police power, a state may enact a statute to promote public health, safety or the general welfare. *Rothman v. Rothman,* 65 *N.J.* at 225. Although retroactive application of a statute may impair private property rights, when protection of the public interest so clearly predominates over that impairment, the statute is valid. *Id.* In this case, we find that the public interest outweighs any impairment of private property rights.

■ Further, the Spill Act does not so much change substantive liability as it establishes new remedies for activities recognized as tortious both under prior statutes and the common law. *Supra* at 900–903, 904–905. A statute that gives retrospective effect to essentially remedial changes does not unconstitutionally interfere with vested rights. *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 *N.J.* 372, 381 (1954). On balance, the benefits accorded to the public by the statute outweigh any burden imposed on the polluters.

■ We note further that Ventron contends that the State, by participating in Ventron's attempt to control pollution at the site, should be estopped from seeking to hold defendants liable for the costs of the cleanup and containment of the mercury. Sometimes by their conduct, public officials may ratify the action of private parties, and that ratification can effect an estoppel. *Board of Educ. v. Hock,* 38 *N.J.* 213, 241 (1962). Before ratification will result in an estoppel of public officials, however, it must be shown that the officials knew or should have known of the material facts. *Id.* That Ventron cooperated with the State in an unsuccessful effort to curb the pollution of the tract can hardly justify foisting on the public the cost of the cleanup and containment.

The remaining question concerns the propriety of imposing liability under the Spill Act on Ventron and Velsicol for the acts

of Wood Ridge. Resolution of this question involves recognition that the limited liability generally inherent in the creation of a corporation presents the potential for avoidance of responsibility for the dumping of toxic wastes by the creation of a wholly-owned subsidiary. Implicit in that consideration is a need to balance the policy in favor of granting limited liability to investors against the policy of imposing liability on polluters for environmental torts. The lower courts struck the balance by piercing Wood Ridge's corporate veil and holding Velsicol liable for the pollution caused by its subsidiary. Although we disagree with the reasoning of those courts, we affirm the finding that Velsicol is responsible for the cleanup of Berry's Creek under the 1979 amendment to the Spill Act.

We begin with the fundamental propositions that a corporation is a separate entity from its shareholders, *Lyon v. Barrett*, 89 *N.J.* 294, 300 (1982), and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise. Berle, "The Theory of Enterprise Entity," 47 *Colum.L.Rev.* 343 (1947); Note, "Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law," 95 *Harv.L.Rev.* 853, 854 (1982); H. Henn, *Law of Corporations* § 146, p. 250 (2d ed. 1961). Even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated. *Muller v. Seaboard Commercial Corp.*, 5 *N.J.* 28, 34 (1950).

Except in cases of fraud, injustice, or the like, courts will not pierce a corporate veil. *Lyon v. Barrett*, 89 *N.J.* at 300. The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, *Telis v. Telis*, 132 *N.J.Eq.* 25 (E. & A.1942), to perpetrate fraud, to accomplish a crime, or otherwise to evade the law, *Trachman v. Trugman*, 117 *N.J.Eq.* 167, 170 (Ch.1934).

Under certain circumstances, courts may pierce the corporate veil by finding that a subsidiary was "a mere instrumentality of the parent corporation." *Mueller v. Seaboard*

*Commercial Corp., supra,* 5 *N.J.* at 34–35; *see generally* Note, "Liability of a Corporation for Acts of a Subsidiary or Affiliate", 71 *Harv.L.Rev.* 1122 (1958). Application of this principle depends on a finding that the parent so dominated the subsidiary that it .had no separate existence but was merely a conduit for the parent. 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.1 (Perm. ed. 1974 rev.); *see* Annot., "Corporations—Torts of a Subsidiary," 7 *A.L.R.*3d 1343, 1355 (1966). Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law. *Mueller v. Seaboard Commercial Corp.,* 5 *N.J.* at 34–35; *see generally* Note, "Liability of a Parent or Affiliate," *supra,* 71 *Harv.L.Rev.* at 1123; 1 Fletcher *Corporations, supra,* § 41.1.

In holding that Velsicol is liable for the acts of Wood Ridge, the lower courts found it "immaterial" that Wood Ridge was not undercapitalized and that it did not engage exclusively in business with Velsicol. 182 *N.J.Super.* at 225. Those courts found dispositive the facts that Velsicol created Wood Ridge for the sole purpose of acquiring and operating Berk's mercury processing business and that, as the trial court found, "Velsicol personnel, directors, and officers were constantly involved in the day-to-day business" of Wood Ridge. By themselves those conclusions are not sufficient to support the further conclusion that the intrusion of Velsicol into Wood Ridge's affairs reached the point of dominance. Furthermore, it appears that Velsicol incorporated Wood Ridge for a legitimate business purpose. Contrary to the implication of the trial court opinion, it is proper to establish a new corporation for the sole purpose of acquiring the assets of another corporation and continuing its business. We cannot conclude that Velsicol incorporated Wood Ridge for an unlawful purpose. See *Rippel v. Kaplus,* 124 *N.J.Eq.* 303, 304 (Ch.1938).

Although it would be inappropriate to pierce Wood Ridge's corporate veil by applying the traditional common-law

doctrine, liability of Velsicol may be predicated upon the 1979 amendment to the Spill Act. As amended, the Spill Act provides: "Any person who has discharged a hazardous substance *or is in any way responsible* for any hazardous substance . . . shall be strictly liable, jointly and severally, without regard to fault, for all clean up and removal costs." *N.J.S.A.* 58:10–23.-11g(c) (emphasis added).

The phrase "in any way responsible" is not defined in the statute. As we have noted previously, however, the Legislature intended the Spill Act to be "liberally construed to effect its purposes." *N.J.S.A.* 58:10–23.11x. The subsequent acquisition of land on which hazardous substances have been dumped may be insufficient to hold the owner responsible. Ownership or control over the property at the time of the discharge, however, will suffice. *See State Dep't of Envtl. Protection v. Exxon Corp.*, 151 *N.J.Super.* 464, 470–74 (Ch.Div.1977). From 1967 to 1974, and thereafter, Velsicol could have controlled the dumping of mercury onto its own thirty-three-acre tract. By permitting Wood Ridge, even after it became a Ventron subsidiary in 1968, to use that tract as a mercury dump, Velsicol made possible the seepage of hazardous wastes into Berry's Creek. Furthermore, from 1960 to 1968, Velsicol was the sole shareholder of Wood Ridge and all members of the Wood Ridge Board of Directors were Velsicol employees. Velsicol personnel, officers, and directors were involved in the day-to-day operation of Wood Ridge. In addition to constant involvement in Wood Ridge's activities, Velsicol permitted the dumping of waste material on the thirty-three-acre tract. When viewed together, those facts compel a finding that Velsicol was "responsible" within the meaning of the Spill Act for the pollution that occurred from 1960 to 1968.

Given the extended liability of the Spill Act, we conclude that the Legislature intended that the privilege of incorporation should not, under the circumstances that obtain here, become a device for avoiding statutory responsibility. A contrary result

would permit corporations, merely by creating wholly-owned subsidiaries, to pollute for profit under circumstances when the Legislature intended liability to be imposed.

The question remains to what extent Velsicol should share with Ventron the costs of containing and cleaning up the contaminated area. Wood Ridge, as a successor landowner that purchased all of the assets and continued the activities of Berk, was liable for the damage caused by its own operations and those of Berk. *See New Jersey Dep't of Transp. v. PCS Resources, Inc.,* 175 *N.J.Super.* 447 (Law Div.1980); *State v. Exxon Corp.,* 151 *N.J.Super.* 464 (Ch.Div.1977); Note, "Successor Landowner Liability for Environmental Torts: Robbing Peter to Pay Paul?," 13 *Rutgers L.J.* 329, 334–42 (1982). Through the merger of Wood Ridge into Ventron, the latter corporation assumed all of Wood Ridge's liabilities, including those arising out of the pollution of Berry's Creek. *See N.J.S.A.* 14A:10–6(c). Ventron, however, did not assume Velsicol's liability.

 Pursuant to the mandate of the Spill Act, *see N.J.S.A.* 58:10–23.11g(c), Berk, Wood Ridge, Velsicol, and Ventron are jointly and severally liable without regard to fault. Only Ventron and Velsicol remain in existence, and we affirm that portion of the Appellate Division judgment that holds them jointly and severally liable for the cleanup and removal of mercury from the Berry's Creek area.

## IV

 Finally, we consider the issues raised by the Wolfs' cross-claim against Ventron, in which the Wolfs alleged fraudulent nondisclosure in the sale of realty. As noted by the trial court, the elements necessary to prove fraudulent concealment on the part of a seller in a real estate action are: the deliberate concealment or nondisclosure by the seller of a material fact or defect not readily observable to the purchaser, with the buyer relying upon the seller to his detriment. *Weintraub v. Krobatsch,* 64 *N.J.* 445, 455 (1974); *Berman v. Gurwicz,* 189 *N.J.Super.* 89 (Ch.Div.1981), *aff'd,* 189 *N.J.Super.* 49 (App.Div.1983),

*certif. den.,* 94 *N.J.* 549 (1983). The trial court found that Ventron knew of a latent defect, gross mercury pollution in the soil, but intentionally failed to disclose that fact to the Wolfs. Furthermore, the court found that the contamination was not readily observable by the Wolfs and that the Wolfs relied upon the nondisclosure to their detriment. The Appellate Division determined that those findings were supported by credible evidence. 182 *N.J.Super.* at 227. We agree, and affirm the judgment in favor of the Wolfs on the cross-claim.

While no proofs on damages had yet been adduced below, that issue having been set aside for separate trial, both lower courts commented upon limitations and inclusions ultimately applicable to the award. Specifically, both courts found that "the cost of the containment system may be recoverable, as well as the legal fees incurred by the Wolfs in defense of the action brought against them by DEP." 182 *N.J.Super.* at 228.

In approving the award of counsel fees, the trial court relied on the theory that the contamination of the tract constituted a breach by Ventron of the covenant against encumbrances in its deed to the Wolfs. Without addressing the correctness of that theory, the Appellate Division affirmed the award, apparently because Ventron had defrauded the Wolfs. *Id.* Neither court expressly found that Ventron's fraud was the proximate cause of the DEP action against the Wolfs.

■ Our review begins with the general rule that sound judicial administration is best advanced if litigants bear their own counsel fees. *Right to Choose v. Byrne,* 91 *N.J.* 287, 316 (1982). Consistent with this policy, legal expenses, whether for the compensation of attorneys or otherwise, are not recoverable absent express authorization by statute, court rule, or contract. *R.* 4:42–9; *Cohen v. Fair Lawn Dairies, Inc.,* 86 *N.J.Super.* 206 (App.Div.), *aff'd* 44 *N.J.* 450 (1965); *Jersey City Sewerage Auth. v. Housing Auth. of Jersey City,* 70 *N.J.Super.* 576 (Law Div. 1961), *aff'd* 40 *N.J.* 145 (1963). A further exception obtains where counsel fees are awarded to "[o]ne who through the tort of another has been required to act in the protection of his

interests by bringing or defending an action against a third person .... " *Restatement (Second) of Torts* § 914(2); *see Dorofee v. Pennsauken Township Planning Bd.,* 187 *N.J.Super.* 141, 144–46 (App.Div.1982); *Pressler, Current N.J. Court Rules,* Comment *R.* 4:42–9.

Accordingly, in a fraud action, such as that asserted in the Wolfs' cross-claim against Ventron, if a third party sues one who has been defrauded, as DEP sued the Wolfs, the defrauded party "may recover from the tortfeasor the expenses of that litigation, including counsel fees, as damages flowing from the tort." *Dorofee v. Pennsauken Township Planning Bd., supra,* 187 *N.J.Super.* at 144; *Feldmesser v. Lemberger,* 101 *N.J.L.* 184, 187 (E. & A.1925); *Hagen v. Gallerano,* 66 *N.J.Super.* 319, 333 (App.Div.1961). That is, the Wolfs may recover from Ventron that portion of their legal expenses that was incurred as a proximate result of Ventron's fraud.

Although we have affirmed the findings that Ventron defrauded the Wolfs and that the Wolfs contributed minimally to the pollution, it is an open question whether it was Ventron's fraud or the Wolfs' own acts, or both, that caused the Wolfs to incur counsel fees in defense of the DEP action. Consequently, the Wolfs' right to counsel fees, like the other elements of damages, must be remanded to the trial court for further proceedings. The Wolfs may not recover the part of their counsel fees attributable to defending their own acts. Nor may they recover the portion of the counsel fees incurred in prosecuting their own claim against Ventron.

As modified, the judgment of the Appellate Division is affirmed.

*For affirmance as modified* —Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal* —None.