227 N.J. Super. 228 (1988)
546 A.2d 570
T & E INDUSTRIES, INC., PLAINTIFF-APPELLANT,
v.
SAFETY LIGHT CORPORATION; USR INDUSTRIES, INC.; USR LIGHTING, INC.; USR METALS, INC.; USR CHEMICALS, INC. AND US NATURAL RESOURCES, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1988.
Decided August 11, 1988.
*230 Before Judges KING, GAULKIN and GRUCCIO.
Edward A. Zunz, Jr. argued the cause for appellant (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Edward A. Zunz, Jr. and Stuart M. Lederman, on the brief).
Albert G. Besser argued the cause for respondents (Hannoch Weisman, attorneys; Albert G. Besser and Kevin J. Bruno, on the brief).
The opinion of the court was delivered by GRUCCIO, J.A.D.
Plaintiff T & E Industries, Inc. (T & E) appeals from the trial court's dismissal of its complaint in which damages were sought for the contamination of its property. The contamination occurred more than 50 years prior to plaintiff's acquisition *231 of the property. Defendants, successor corporations of United States Radium Corporation (USRC), the company charged with dumping radioactive waste on the property, were successful on the post-trial motion to set aside the jury verdict on the grounds that it owed no duty to warn a subsequent purchaser and that the doctrine of caveat emptor barred recovery. This order also vacated a previous ruling by the court which held that absolute liability was applicable in this case. Upon this review, we are asked to consider whether dismissal of plaintiff's complaint was proper. We deem it necessary to recount detailed facts which provide the basis for this opinion.
During the period from about 1917 to 1926, USRC conducted a radium-processing operation in Orange, New Jersey. Utilizing a fractional crystallization process, USRC extracted about 80% of the radium from the carnotite ore which was brought by railroad from Utah and Colorado to the Orange site. The radium was sold commercially for $3,220,000 an ounce, primarily for medical purposes, but was also used onsite in a variety of commercial applications including the manufacture of luminous paint which was applied to instrument dials, watches and other products. The by-products of this operation consisted of both liquid and solid materials. The liquid waste was disposed of in the Orange sewer system. The solid waste, commonly referred to as "tailings," contained radium and was deposited onto the vacant and unimproved portions of the site.
Carnotite ore consists primarily of uranium, radium and vanadium. Uranium 238, first in the radioactive decay chain, contains an unstable nuclide which results in a series of decays creating other elements as the nucleus disintegrates by spontaneous emission of charged particles. The half-life of Uranium 238, the time required for a radioactive substance to lose 50% of its activity by decay, is 4.5 billion years. One of the products of the decay of Uranium 238 is Radium 226 which has a half-life of 1,600 years. Radium 226, in turn, decays to Radon 222 which is a naturally occurring radioactive gas having a half-life of 3.8 days. The decay of radon in the atmosphere results in the *232 formulation of radon decay products known as radon daughters or radon progeny which include bismuth, lead and polonium. The radon daughters are ionized alpha particles which can attach to walls, ceilings and, of critical importance, dust particles.
Inhalation of such ionized particles in excessive amounts can result in cancer. Gamma rays emitted by radium, as distinguished from radon, can also cause cancer. To the extent, therefore, that the concentrations of radium and radon in a given environment approach the levels of risk which have been scientifically and empirically verified, there is a danger to human health.
In 1926, USRC and other radium processors in the United States ceased all radium processing activities because richer ore was available in the Belgian Congo. The company permanently closed the Orange site but continued to produce fluorescent compounds at its New York headquarters. The property remained vacant until the mid-1930's when portions of the original structure were leased to various commercial tenants. On November 26, 1943, USRC sold the property to Arpin, a tenant from the previous four years, and thereby terminated its connection with the property.
While a tenant, Arpin became aware of USRC's past radium processing operations and its disposition of tailings onto vacant portions of the property. It built an addition to the rear portion of the building which covered part of the area where tailings had been dumped. Arpin did not perceive the structure as causing a risk to health, nor did a laboratory engaged to sample the tailings for what Arpin hoped might be valuable uranium. The property was sold in 1950 and, subsequently, title passed three times between 1950 and 1969. T & E leased the premises in 1969 and purchased it on June 5, 1974. The title search showed USRC's original ownership of the property.
In March 1979, the New Jersey Department of Environmental Protection (DEP) informed T & E that it believed levels of *233 radiation exceeding natural levels existed on the property. The DEP installed long-term monitoring equipment to measure the levels of radon, radon progeny and gamma radiation on the property. On November 20, 1979, DEP advised T & E that excess levels of radiation existed on the property. Access to T & E's oven room was restricted to 25 hours per week for any one worker because of the level of gamma radiation in that area. T & E was directed to keep a log of persons going into or through the contaminated areas. DEP asked for permission to require certain T & E personnel to wear monitoring devices so that specific dose rates could be ascertained. With regard to radon and radon progeny, T & E was told to "begin immediate remedial action."
T & E advised DEP on December 3, 1979, that it had painted a yellow line on the floor of the oven room around the area of gamma radiation, ordered signs warning employees not to remain in the affected area more than 25 hours per week and implemented a log report system. Dr. Kenneth Steidley, a health physicist, was retained to address the engineering considerations associated with the presence of radon and radon progeny. He recommended to Leonard Box, president of T & E, that tests be conducted on the air and soil to confirm or deny the State's data. T & E secured an instrument from the State to measure the radon progeny. The measurements disclosed results far exceeding the State limit of.01 working level. Dames & Moore, a consulting firm retained by Safety Light Corporation (Safety), also examined the premises. Their readings in May and June 1983 exceeded the State standards and the State measurements despite the remedial measures which had been taken prior to Dames & Moore's readings.
Box purchased a geiger counter, as well as air sampling and radon testing equipment. The test results were in general agreement with the State's findings but those findings exceeded the State regulations that set maximum levels for radioactive material. At the levels existing on the T & E property, an employee working in the oven room for a 30-hour week would *234 reach the exposure limit in 10.8 years. An employee in the assembly area would reach the State level in 3.18 years.[1]
In light of these levels, Steidley recommended interim remedial measures. To that end, Box sealed all the cracks, expansion joints and the sewer drains in the oven room. However, this did not effectively keep radon out, although it slightly lowered the working levels. Steidley and Box then tried ventilation by the use of five fans. This was effective but could not be used when it was cold or very warm. The ultimate recommendation was removal of the soil from beneath and around the building. This could only be accomplished by tearing down the building which was not feasible  the disruption of the business and cost were too great.
Steidley testified that as the amount of radiation to which an individual is exposed increases, the risk to human health also increases. The more radon progeny inhaled, the greater the damage. This opinion is shared by three scientific organizations: The National Council of Radiation Protection, The National Research Council, and The International Commission on Radiological Protection. Increased radiation and radioactivity lead to enhanced risk. During his testimony, Steidley read into the record an announcement by the Environmental Protection Agency (EPA), which asserted that "there is some finite risk to humans no matter how small the amount of absorbed radiation and that the risk at any given low level is directly proportional to the damage demonstrated at higher doses."[2]
Box decided to move the T & E operations because of the perceived health threat to the employees and the prospect of the State compelling such a move. T & E needed a building *235 with approximately 18,000 square feet, and one that would be within a one-mile radius of the existing location. Adequate power and water were also required. Finally, a satisfactory building was located. Once the premises was altered and modified to meet T & E's needs, the operations were moved to the new location in July 1985.
During the period of 1917 to 1943, the following incidents and information were available to USRC to charge it with the knowledge that radium processing was dangerous. Florence Wall worked in USRC laboratory. Even prior to 1920, part of her job was to analyze every ore sample by calculating the amount of radium being extracted from the ore and measuring the amount of radon emanating from the radium. In performing her duties she wore a lead-lined apron for protection.
Some employees who painted the watch dials would dip their brushes into the luminous paint, apply the paint, then lick the brush after each application to make a fine point for the next application, thereby ingesting a minute amount of radium each time they licked the brush. It was discovered in the 1920's that, as a result, many of these employees contracted cancer. Subsequently, USRC posted warnings that employees were not to sharpen the brushes in their mouths.
Gordon Cameron was USRC's chemical engineer between 1922 and 1926. He was aware at that time of the dangers of radiation from radium and knew about radon and its dangers by about 1928 or 1930. Cameron eventually became sterile from exposure to radiation.
Dr. Von Sochocky, president of USRC, performed research at the plant. At one point, radium became impacted under his fingernail. Subsequently, he cut off his own finger for fear of the results due to the radium.
In 1939 it was known that in the industrial refining and application of radioactive substances, gas emanations almost invariably escape into the air and inhalation of those gases was known to be hazardous. Inhalation of radon over a long period *236 of time was known to lead to lung cancer. By 1940 the scientific community accepted as fact that exposure to radon and radon progeny was injurious to health.
USRC's president wrote a letter to the War Department dated December 9, 1943, in which he set forth in graphic detail defendant's awareness of the dangers of radium and radon in 1943. The letter was to the Price Adjustment Board seeking an increase in the contract price of the uranium. Some of the justifications posited related to expenses for employees injured by contamination and steps necessary for employee protection. In stating his knowledge of the existing hazards he cited four incidents in which USRC employees died from exposure to radium: A chief chemist's lungs became radioactive from inhaling radon gas or radioactive dust and he died as a result; another employee died from limited external gamma radiation exposure; a technical director died from exposure to radon gas and external gamma radiation, and another USR officer who had limited exposure to radon gas and gamma radiation, developed lung cancer and died.
Reference was also made at trial through entry as a plaintiff's trial exhibit to the publication "Safe Handling of Radioactive Luminous Compound," U.S. Department of Commerce, National Bureau of Standards, May 2, 1941. This pamphlet, designated Handbook H27, was prepared by a committee which included prominent scientists and members of the industry. Among those on the committee was J.E. Paul representing USRC. The pamphlet recognized the hazards of handling radioactive compounds and offered several measures of precaution.
T & E ultimately sued Safety and several other corporate entities, all of which are successor corporations to USRC, for damages due to the radium contamination of the Orange property. The suit was predicated on absolute liability, nuisance, negligence, misrepresentation and fraud. Compensatory and punitive damages were sought along with indemnification and *237 reimbursement for actual and potential costs of carrying and decontaminating the site.
The trial court granted T & E's pretrial motion for partial summary judgment and held that USRC "placed hazardous wastes in the form of radium ore tailings on the real property located at 420-422 Alden Street, Orange, New Jersey." Subsequently, defendants moved for summary judgment on the ground that State, Dept. of Envtl. Protect. v. Ventron Corp., 94 N.J. 473 (1983), and 3 Restatement, Torts 2d, § 520 at 36 (1976), were not applicable to a claim by a successor in title against a former owner. Denying this motion, the court held that "as a matter of law the principle of strict liability is applicable to a former owner of premises depositing thereon `abnormally dangerous' substance(s) in an amount dangerous to health and life in an action against the former owner by a successor in title thereto unaware of the presence of the ... substances." The trial judge also held that radium was a "per se `abnormally dangerous'" substance.
At the end of plaintiff's case, the trial court granted defendants' motion to dismiss plaintiff's absolute liability claims, contrary to the previously entered order. Therefore, plaintiff had tried its entire case relying on the trial court's earlier decision that the issue of absolute liability was summarily disposed of in its favor. The trial court had also dismissed plaintiff's claims of fraud, misrepresentation, reckless conduct and punitive damages. At the close of defendants' case, defendants moved to dismiss plaintiff's negligence claims which were the only claims left in the case at that stage. The primary basis for the motion was the asserted absence of a duty to warn of the dangers of the tailings buried on the property. Reserving decision on the motion, the trial court submitted the negligence issue to the jury under the following questions:
1. [W]as U.S. Radium negligent in not warning the purchaser of the Orange premises in 1943 that the presence of radioactive tailings on the premises constituted a potential risk to the health or property?

*238 2. Was U.S. Radium's negligence in 1943 a proximate cause of plaintiff's damages?
3. Subsequent to 1943 should U.S. Radium have learned that the tailings deposited on the Orange, New Jersey premises constituted a potential risk to health or property?
4. [W]as U.S. Radium negligent in not warning plaintiff before its purchase of the property in 1974 that the tailings on the Orange, New Jersey premises constituted a potential risk to health or premises?
5. [W]as U.S. Radium's negligence in or prior to 1974 a proximate cause of plaintiff's injury?
The sixth question asked the jury to calculate the amount of damages.
The jury returned a no-cause-of-action verdict on the 1943 claim and a verdict for plaintiff on the 1974 claim. The jury answered "no" to question 1 and therefore did not answer question 2, and answered affirmatively to questions 3, 4 and 5. Damages were fixed at $372,100.22, the maximum permitted by the trial court. Defendant moved to set aside the jury verdict on the ground that it owed no duty to warn in 1974. Plaintiff moved to set aside the order dismissing its absolute liability claim and sought judgment for indemnification. The trial court granted defendant's motion solely on the ground that the doctrine of caveat emptor barred plaintiff's negligence award, and entered an order dismissing all counts of the complaint.
On appeal, plaintiff raises five main issues. First, plaintiff argues that the trial court erred by vacating its original partial summary judgment order and dismissing the absolute liability claim altogether. Second, plaintiff contends that the trial court erred in its treatment of the various negligence claims. Third, plaintiff alleges various trial errors. Fourth, plaintiff argues that the trial court erred in excluding from jury consideration substantial damages sustained by it. And fifth, plaintiff contends the dismissal of the indemnification claim was error.
We treat only the absolute liability claim for we see it as clearly dispositive of this appeal. The issue of toxic waste is a sensitive issue of paramount concern in today's society. Yet, many of today's problems due to toxic waste are a result of *239 yesterday's mistakes. These are mistakes for which yesterday's perpetrators must be held responsible.
"[T]hose who use, or permit others to use, land for the conduct of abnormally dangerous activities are strictly liable for resultant damages." Ventron, 94 N.J. at 488. The Court in Ventron retained the doctrine of absolute liability; however, it used the description "abnormally dangerous" for "ultra-hazardous" in describing the activity for which that doctrine will apply. See Kenney v. Scientific, Inc., 204 N.J. Super. 228, 246 (Law Div. 1985), citing Ventron, 94 N.J. at 491.
Section 519 of Restatement, Torts 2d articulates the general principle of liability for abnormally dangerous activities by saying that "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." 3 Restatement, Torts 2d, § 519 at 34 (1976).
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of another;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes. [3 Restatement, Torts 2d, § 520 at 36 (1976)].
Our Supreme Court has concluded as a matter of law that handling toxic waste is an abnormally dangerous activity.
[W]e conclude that mercury and other toxic wastes are "abnormally dangerous," and the disposal of them, past or present, is an abnormally dangerous activity. We recognize that one engaged in disposing of toxic waste may be performing an activity that is of some use to society. Nonetheless, "the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it." [Ventron, 94 N.J. at 493 quoting 3 Restatement, Torts 2d, § 520 comment h, at 39 (1976)].
*240 Uranium tailings are clearly toxic waste[3] thereby making it abnormally dangerous. Therefore, the processing of radium and the disposal of its waste product is an abnormally dangerous activity as a matter of law.
"Strict liability ... refers to liability that is imposed apart from any recovery on a theory that defendant knowingly or purposely interfered with a legally protected interest or was negligent." W. Prosser & W.P. Keeton, Prosser and Keeton on the Law of Torts § 78, at 554 (D. Dobbs, R. Keeton, W.P. Keeton & D. Owen 5th ed. 1984). Even though neither Ventron nor the Restatement makes knowledge of the danger a controlling factor in determining liability, we note that the record clearly indicates that USRC did have a strong measure of knowledge of the dangers of radium. As the facts indicate, there were several incidents which occurred during the period when USRC operated the radium processing facility and owned the property that charged USRC with the knowledge that it was dealing with a dangerous substance and in a dangerous activity. Therefore, while knowledge of the dangerous substance and activity may have some bearing in determining the applicability of the absolute liability doctrine, the knowledge of the resulting damage or danger, whatever it may be, is irrelevant. In this case, the fact that USRC did not specifically know *241 that radium tailings creating radon gas had an increased danger when the contaminated property was built upon, is irrelevant. As Justice Jacobs opined and Justice Pollock echoed, "an ultrahazardous [now abnormally dangerous] activity which introduces an unusual danger into the community ... should pay its own way in the event it actually causes damage to others." Berg v. Reaction Motors Div., Thiokol Chem. Corp., 37 N.J. 396, 410 (1962), quoted in Ventron, 94 N.J. at 487.
Defendants contend that these principles of liability are only applicable when actions on one's own property interferes with the rights of another holding adjacent or nearby property, not to the successor in title of the contaminated property. They concede that if their actions had affected adjacent or nearby property, then liability would rest on their shoulders. Defendants correctly note that the nascent stages of English common law which formed the backdrop for the imposition of strict liability in Rylands v. Fletcher, L.R. 1 Ex. 265 (1866), aff'd, L.R. 3 H.L. 330 (1868), as well as the teachings of Ventron, the textbook discussion in Ventron and the Restatement all dealt with a neighboring property owner's right to enjoy the use of his own land, free from interference. However, we do not adopt this distinction urged by defendants. We see no practical or legal distinction between the rights of a successor in title to use and enjoy its land and the rights of a neighboring property owner. Both have rights and both can suffer injury through the acts of a prior owner.
Of course, the rights of the parties in the sale of real estate can be fixed and adjusted by contract. But here, we are dealing with an innocent purchaser which had no notice of the contaminated condition of the property, a latent defect. We are not addressing the question of fraud but merely stating that the liability may be altered by contract in appropriate circumstances.
Likewise, the doctrine of caveat emptor is outdated in today's complex society and has been generally abandoned in *242 many settings. We are satisfied that the doctrine of caveat emptor cannot insulate defendants from liability here. In McDonald v. Mianecki, 79 N.J. 275 (1979), Justice Pashman discussed in great detail the history and viability of the doctrine of caveat emptor. Quoting with approval an earlier decision of the Court, he stated:
We noted that caveat emptor was an established doctrine in real estate law but emphasized that:
[t]he law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected. * * *
[Id. at 291, quoting Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 90 (1965)].
The times call for the rejection of this ancient doctrine here. We therefore hold that it is not valid for parties seeking to avoid liability in situations such as this to claim caveat emptor. The party who creates such a condition is absolutely liable and cannot avoid that responsibility unless a purchaser knowingly accepts that burden. There is case law to the contrary. See. e.g., Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303 (3d Cir.1985). We find it unpersuasive in light of Ventron.
We note that two of the defendants in Ventron, the Wolfs, were innocent successors in title to a portion of the mercury contaminated property. The trial court there held them not liable for the clean-up costs and we affirmed. State, Dept. of Envtl. Protect. v. Ventron Corp., 182 N.J. Super. 210, 227-228 (App.Div. 1981). The DEP did not petition the Supreme Court for certification on that issue. However, the Supreme Court noted that the Wolfs did not contaminate the land and were "responsible for only a minimal aggravation of the underlying hazardous condition." Ventron, 94 N.J. at 493. Such language suggests that the Supreme Court was in agreement with the findings of no liability for the Wolfs due to the fact that they were not responsible for the contamination of the property. It is significant to note this because plaintiffs here had no responsibility in contaminating the Orange site and at best *243 were responsible for only a minimal aggravation by innocently constructing an addition to the building over the contaminated property.
"[W]e are here primarily concerned with the underlying considerations of reasonableness, fairness and morality rather than the formulary labels to be attached to the plaintiff's causes of action or the legalistic classifications in which they are to be placed." Berg, 37 N.J. at 405. Irrespective of whether this is a nuisance or a trespass, we are dealing with a continuous interference, in essence, a continuing tort. While the act of disposing of the toxic waste took place many years ago, the effects of gamma radiation and radon gas from the radium tailings will be felt from that time forward until such time that permanent curative action is taken. Therefore, the tort emanates from the act of dumping and is the continuous presence of the toxic waste and the resultant hazardous byproducts. Absolute liability is applicable in this situation because of the nature of the abnormally dangerous activity. The responsibility for that liability must fall upon defendants, for they, as successor corporations of USRC, are the parties which created the situation and caused the damage.[4]
Public policy likewise calls for such a decision. In recent years the public's concern over toxic waste sites, and the treatment and disposal of those wastes, has greatly increased. The Legislature has enacted the Spill Compensation and Control Act. N.J.S.A. 58:10-23.11 et seq.[5] That act holds "[a]ny person *244 who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing ... shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs." N.J.S.A. 58:10-23.11g(c). The strict liability imposed has been held to be broad in scope. State, Dept. of Envtl. Protect. v. Arky's Auto Sales, 224 N.J. Super. 200, 206 (App.Div. 1988). See In the Matter of the J.I.S. Indus. Serv. Co. Landfill, 110 N.J. 101 (1988), and In the Matter of the Directive of the State, Dept. of Envtl. Protect., Issued to Kimber Petroleum Corp., 110 N.J. 69 (1988), for a discussion of the treble damages portion of the Spill Act and the nearly absolute nature of the Spill Act's liability. N.J.S.A. 58:10-23.11g(c) has been held to apply retroactively. Ventron, 94 N.J. at 497.
Such a strict liability theory, as well as the teachings of Ventron and the Restatement, Torts 2d, are clear evidence of a trend toward absolute liability in situations such as this. Absolute liability is necessary to protect the innocent purchaser as much as to protect society itself. Whenever possible, the party responsible for creating the toxic waste hazard should be the party responsible for the clean-up of that hazard and any damage proximately caused by that hazard, whether or not that damage was foreseeable at the time the hazard was created. As Justice Pollock stated in Ventron, 94 N.J. at 493 and Judge Coleman reiterated in Inmar Assoc., Inc. v. Carlstadt, 214 N.J. Super. 256, 268 (App.Div. 1986), "[t]hose who poison the land must pay for its cure."
Accordingly, the judgment in favor of defendants is reversed. The matter is remanded to the Law Division for the entry of judgment on liability in favor of plaintiff and a new trial on the issue of damages. Since the theory of absolute *245 liability was not presented to the jury for its consideration on the issue of damages, the entire damage award is reversed. In light of our finding of absolute liability, the previous limits on damages would be unduly restrictive at the new trial and therefore, the damages issue must be thoroughly considered absent those limits and under the teachings of this opinion.
REVERSED AND REMANDED.
NOTES
[1] See N.J.A.C. 7:28-6.1, et seq., for the State standard of working levels for radon progeny.
[2] Indoor Radiation Exposure Due to Radium-226 in Florida Phosphate Lands; Radiation Protection Recommendations and Request for Comment, 44 Fed.Reg. 38664, 38667 (1979).
[3] The Uranium Mill Tailings Radiation Control Act of 1978 was enacted due to the recognition of the hazardous nature of uranium mill tailings. 42 U.S.C. § 7901 et seq. (1982). Congress concluded that "uranium mill tailings located at active and inactive mill operations may pose a potential and significant radiation health hazard to the public." 42 U.S.C. § 7901(a). See generally 40 C.F.R. § 192 et seq. (1987). We also note that the United States District Court for the District of New Jersey held in a related Federal action that "radionuclides, such as radium and radon, have been designated as `hazardous substances' under CERCLA. 42 U.S.C. § 9601(14)(B), (E)." T & E Indus., Inc. v. Safety Light Corp., 680 F. Supp. 696, 709 (D.N.J. 1988). See Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601(14)(C) (1982), and Solid Waste Disposal Act, 42 U.S.C. § 6921(b)(3)(A)(ii) (1982). For a discussion of the Uranium Mill Tailings Radiation Control Act see Note, Unfinished Business: The Regulation of Uranium Mining and Milling, 18 U.Rich.L.Rev. 615 (1983-84).
[4] The fact that a building was constructed by an intervening owner upon the property which, in part, concededly created a dangerous concentration of the gamma radiation and the radon gas, does not act to shift liability. This was a normal use of the property by an innocent party ignorant of the consequences of its actions.
[5] There has also been a significant amount of federal legislation. See Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. (1982); Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq. (1982), and Uranium Mill Tailings Radiation Control Act of 1978, 42 U.S.C. § 7901 et seq. (1982).