238 N.J. Super. 394 (1989)
569 A.2d 908
PROSPECT INDUSTRIES CORP., PLAINTIFF,
v.
THE SINGER COMPANY, DEFENDANT/THIRD-PARTY PLAINTIFF,
v.
MONSANTO COMPANY, THIRD-PARTY DEFENDANT. UNITED STATES LAND RESOURCES, INC., PLAINTIFF,
v.
PROSPECT INDUSTRIES CORPORATION, ET AL., DEFENDANTS, AND THE SINGER COMPANY, DEFENDANT/THIRD-PARTY PLAINTIFF,
v.
MONSANTO COMPANY, THIRD-PARTY DEFENDANT. BROOK WAREHOUSING CORP. AND FINDERNE ASSOCIATES, PLAINTIFFS,
v.
THE SINGER COMPANY, DEFENDANT/THIRD-PARTY PLAINTIFF,
v.
THE MONSANTO COMPANY, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
Decided October 27, 1989.
*395 Picco, Mack, Kennedy, Jaffe, Perella & Yoskin, and Sidley & Austin for plaintiff Prospect Industries Corp.
Schaff, Motiuk, Gladstone, Moeller & Reed for The Singer Company.
Pitney, Hardin, Kipp & Szuch for The Monsanto Company.
Shanley & Fisher for United States Land Resources, Inc.
*396 ARNOLD, P.J.Cv.
The old Singer manufacturing plant in Bridgewater Township is contaminated with polychlorinated biphenyls, or PCBs, and the contamination has spread to the soil and groundwater outside the plant. The contamination occurred as a result of manufacturing operations conducted by the Singer Company (hereinafter "Singer") when hydraulic fluids containing PCBs leaked from die-casting machines. Plaintiff, Prospect Industries Corporation, (hereinafter "Prospect") purchased the plant from Singer in 1977. Although the contract between Prospect and Singer for the purchase of the property provided that Prospect had inspected the property and essentially would take the property "as is" without any warranty by Singer, there is no evidence that Prospect was aware of the PCB contamination.
In this toxic-tort action, Prospect moved for partial summary judgment arguing that the undisputed facts establish that Singer is strictly liable to Prospect for damages because Singer conducted an abnormally dangerous activity in the plant. Prospect relies on the decision of the New Jersey Supreme Court in State, Dept. of Environ. Protect. v. Ventron Corp. 94 N.J. 473, 468 A.2d 150 (1983) in support of its motion. In Ventron the Court held that the "disposal" of a toxic waste gives rise to the common law tort of engaging in an abnormally dangerous activity which results in strict liability for such conduct. Prospect's motion seeks an order requiring Singer immediately to clean up the PCB contamination inside the plant. Singer opposes the motion on numerous grounds. The principal ground argued in opposition to the motion is that Singer did not engage in an abnormally dangerous activity because it did not "dispose" of a toxic waste as defendant did in Ventron, but only consumptively used hydraulic fluids in its manufacturing process not knowing at the time that the hydraulic fluids contained toxic substances. Singer also argues that the issue of strict liability cannot be decided on a motion for summary judgment because it requires a fact-sensitive analysis of all the relevant circumstances under the Restatement, Torts 2d, § 520 (1977).
*397 Furthermore, Singer argues that they are not strictly liable to Prospect because Prospect essentially purchased the property "as is." Prospect's motion thus raises the novel issue of whether strict liability can be imposed on a prior landowner to a successive purchaser for contamination as a result of leaks during a manufacturing process of a substance only later learned to be hazardous and whether summary judgment can be granted as a matter of law without making an analysis of the Restatement factors. This opinion is intended to supplement this court's oral opinion rendered on October 27, 1989.
Singer built its Bridgewater Township manufacturing plant in 1942 and operated it until 1977 when it sold the plant to Prospect. In 1968, Singer installed two hydraulic die-casting machines in the plant. From 1968 through 1972 Singer used thousands of pounds of hydraulic fluid purchased from the Monsanto Company in these die-casting machines. These hydraulic fluids contained very high percentages of PCBs. According to the deposition testimony of Singer's corporate manager of environmental control these hydraulic fluids routinely leaked from the hoses, connectors, O-rings and seals of the die-casting machines and he concluded that the PCB contamination in the plant is due to the wood-block floors in the plant being soaked with these PCB laden hydraulic fluids. Despite almost four years of intensive pretrial discovery in this action there is absolutely no evidence of any other source for the PCB contamination in the plant except for an unsubstantiated possibility set forth in Singer's brief that Westinghouse transformers in the plant may have leaked PCBs. Singer did not clean up the contamination in the plant before selling it to Prospect in 1977. Prospect manufactured steel containers in the plant from 1977 through 1985, but there is no evidence that Prospect ever used PCBs in the plant.[1]
*398 In late 1984, Prospect became interested in selling the plant. Since Prospect was aware that it needed approval of any sale from the Department of Environmental Protection (hereafter "DEP") under the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq. (hereafter "ECRA"), it had environmental tests performed on the property. These tests revealed the presence of PCBs and, in 1985, the DEP instructed Prospect to seal off the plant and to notify the DEP of the status of remedial work in ten days. However, no remedial work to remove the contamination has ever been done. The plant has been closed since 1985 because of serious health hazards and it cannot be sold because ECRA approval cannot be obtained until the contamination has been eliminated. In August 1989, the DEP ordered both Prospect and Singer to remove various types of pollution from the plant site, including the PCB contamination, but the DEP has not charged that Prospect caused any of the PCB contamination.
Prospect relies on the decision in Ventron and its progeny in support of its motion for partial summary judgment. In Ventron, the Court held strictly liable prior owners of property who processed mercury and disposed of it on the property. The Court held the prior owners strictly liable because they were at all times engaged in an abnormally dangerous activity  dumping toxic mercury. That activity poisoned the land and a neighboring creek and the prior owner was held liable even if it did not intend to pollute and adhered to the standards of the time. Ventron, supra, 94 N.J. at 493, 468 A.2d 150. The opinion of the Court concluded broadly that, "Those who poison the land must pay for its cure." Ibid.
The principal ground argued by Singer, in opposition to Prospect's motion for summary judgment, is that it did not "dispose" of a toxic waste so that the holding in Ventron is not applicable to the facts and circumstances of this case. Certainly in Ventron the toxic waste found its way into the soil and water because of intentional dumping. Furthermore, the use of *399 a fluid in a manufacturing operation is a different activity than the dumping of that fluid. However, in determining whether Singer was engaged in an abnormally dangerous activity this court believes that the activity to be examined is not manufacturing, but rather the leakage of hydraulic fluids from the machinery. While this leakage is less egregious than the dumping in Ventron, the failure of Singer to control this leakage is sufficiently similar to the actions of defendant in Ventron to conclude that it should be considered a "disposal." Amland Properties Corp. v. Aluminum Co. of America, 711 F. Supp. 784, 806 (D.N.J. 1989).
Singer also argued that the decision in Ventron is inapplicable because the Court was discussing the definition of the term "discharge" under the New Jersey "Spill Compensation and Control Act" (Spill Act), N.J.S.A. 58:10-23.11 et seq. However, the opinion of the Court stated: "[T]he Spill Act does not so much change substantive liability as it establishes new remedies for activities recognized as tortious both under prior statutes and the common law." Ventron, supra, 94 N.J. at 499, 468 A.2d 150.
Singer also argued that this court should not grant Prospect's motion for summary judgment because a determination of whether Singer engaged in an abnormally dangerous activity requires a fact-sensitive analysis of all the relevant circumstances set forth in the Restatement, Torts 2d, supra, § 520. Singer relies on the holding in Amland Properties Corp. v. Aluminum Co. of America, supra, in support of this argument.
The facts in Amland are very similar to the facts in this case. In Amland, the owner of an industrial plant sued a previous owner, Alcoa, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9601 et seq., seeking recovery of costs it incurred in evaluating and responding to PCB contamination at the plant. The owner also alleged that Alcoa was strictly liable for those costs. The PCB *400 contamination, as in this case, resulted from the use of hydraulic fluids containing PCBs in manufacturing operations. On cross-motions for summary judgment, the court held that: (1) Alcoa's activities, although considered a "disposal," could not be deemed abnormally dangerous as a matter of New Jersey law, and (2) in order to determine whether Alcoa's activities were abnormally dangerous required a "case by case" analysis of the factors set forth in § 520 of the Restatement, Torts. Since both plaintiff and Alcoa agreed that there were questions of fact regarding the Restatement factors, the court denied plaintiff's motion for summary judgment.
This court disagrees with this part of the holding in Amland and holds that there is no need to examine the Restatement factors, because, as this court understands the holding in Ventron, it is that, as a matter of New Jersey law, the handling of a substance containing toxic wastes is an abnormally dangerous activity even if it is not known by defendant that the substance contains toxic wastes. This interpretation of the holding in Ventron is supported by the decision of T & E Industries, Inc. v. Safety Light Corp., 227 N.J. Super. 228, 546 A.2d 570 (App.Div. 1988), certif. granted 117 N.J. 118, 119, 564 A.2d 848 (1989) in which the court stated, "Our Supreme Court has concluded [In Ventron] as a matter of law that handling of toxic waste is an abnormally dangerous activity." Id. 227 N.J. Super. at 239, 546 A.2d 570. This interpretation of the holding in Ventron is also supported by the decision in Kenny v. Scientific, Inc. 204 N.J. Super. 228, 497 A.2d 1310 (Law Div. 1985). While T & E, Kenny and Ventron all involved the direct disposal or dumping of toxic wastes this court regards the holding in Ventron as so broad as to encompass contamination resulting from leakage of a substance containing toxic waste during a manufacturing operation, especially where it is undisputed that the contamination has spread to the soil and ground water outside the building. Strong public policy considerations support this view. For example, the Spill Act, N.J.S.A. 58:10-23.11 et seq., imposes strict liability without regard to fault for all cleanup and *401 removal costs upon any person who is "in any way responsible for any hazardous substance...." N.J.S.A. 58:10-23.11g(c). As stated by the Court in Ventron, "Those who poison the land must pay for its cure." 94 N.J. at 493, 468 A.2d 150.
Nevertheless, Singer contends that it is inappropriate to grant summary judgment arguing that there are material questions as to whether Prospect contributed to the contamination problem with their actions after the purchase of the land. Comment (a) to § 523 of Restatement, Torts 2d, states, regarding strict liability, that:
[T]he ordinary contributory negligence of the Plaintiff in failing to discover an abnormally dangerous activity or to take precautions against it is not a defense to the strict liability of the actor who carries it on.... [at ___]
On this issue, Ventron contains an interesting aspect which is almost directly on point. In Ventron, defendant had sold the contaminated property to the Wolfs who were unaware of the contamination. After the purchase the Wolfs did not dump new toxic waste but aggravated the pollution by using some of the contaminated water to "wet down" buildings that they were demolishing. That use of the contaminated water by the Wolfs added to the overall contamination problem, but the trial judge found that the Wolfs were not liable for the costs of cleanup and containment and the DEP did not petition for certification. The decision of the Supreme Court did not suggest that the Wolfs would be liable for the clean up.
In the case at hand, Singer contends that plaintiffs contributed to the problem by: (a) having a major water leak in the building after which they swept the dirty water outside, and (b) leaving contaminated wooden blocks outside, exposed to the elements, even after they were told to contain the same. Like the Wolfs, Prospect perhaps aggravated the problem by their actions. After four years of litigation and very extensive discovery, however, Singer has produced no evidence (no affidavit has been submitted) to show that Prospect ever used PCBs on the property or engaged in dumping PCBs. Therefore, under Ventron and its treatment of the Wolfs, this court holds *402 that any possible aggravation of the pollution by Prospect's actions is irrelevant, given the fact that they did not add any PCBs to the site. Therefore, Prospect's possible contributory negligence does not defeat this motion for summary judgment.
Next, Singer contends that the holding in Ventron is applicable only when actions on a defendant's property interferes with the rights of a neighbor and that the holding in Ventron is inapplicable between a prior owner and successor in title of the contaminated property. Singer argues that the leading New Jersey case on this point, T & E Industries Inc. v. Safety Light Corp., supra, is currently under review by the New Jersey Supreme Court, and suggests that a motion for summary judgment should not be granted until a decision is rendered by the Supreme Court. In T & E the Appellate Division held that the doctrine of caveat emptor is not a defense to an absolute liability claim by a purchaser against a prior landowner.
This issue came up again in Amland Properties Corp. v. Aluminum Co. of America, supra, and the court followed T & E and held that the New Jersey Supreme Court would impose strict liability as between successive landowners for conducting an abnormally dangerous activity. Id., 711 F. Supp. at 803. This conclusion is sound. Without knowing exactly upon what issues certification was granted, I am not going to delay deciding this motion, because I believe both T & E and Amland are on point and correct in imposing strict liability upon a prior owner in favor of a successor in title. It should be noted that in Ventron, the subsequent purchasers, the Wolfs, were allowed to recover the costs of cleanup and containment.
Therefore, this court holds that the pending appeal in T & E should not act as a bar to this present motion. If the Supreme Court overrules the Appellate Division decision in T & E, then defendant would have every right to move for a reconsideration of this order on that basis. In the meantime, the cleanup of this site should not be delayed.
*403 Finally, Singer appears to argue that the holding in T & E is inapplicable because the contract for sale between Prospect and Singer provided that Prospect essentially agreed to take the property "as is." However, there is no evidence that Prospect knew of the invisible PCB contamination either at the time it entered into the contract or even when it took title. In such circumstances this court holds that the doctrine of caveat emptor is not a defense to a strict liability claim by a purchaser against a prior owner.
Because this court holds that the leakage of PCBs is a disposal and an abnormally dangerous activity, and because this court also holds that strict liability will apply against a prior owner and in favor of a successive landowner, Prospect's motion is granted. The utmost concern of everyone should be cleaning up this dangerously contaminated site. As the owner of the property, at the time of the contamination, and who, by their actions or inactions, caused the release of the PCBs into the environment from their property, defendant, Singer, is strictly liable for the costs of cleaning up the property.
NOTES
[1] The use of PCBs was banned in 1976 by the Toxic Substances Control Act, 15 U.S.C.A. § 2605(e).