250 N.J. Super. 478 (1991)
595 A.2d 534
RUSSELL-STANLEY CORP., A CORPORATION OF THE STATE OF NEW JERSEY, AND RUSSELL-STANLEY WEST, INC., A CALIFORNIA CORPORATION, PLAINTIFFS,
v.
PLANT INDUSTRIES, INC., A DELAWARE CORPORATION, ET AL., DEFENDANTS,
v.
CAMDEN PROPERTIES, INC., ET AL., PLAINTIFFS-INTERVENORS,
v.
PLANT INDUSTRIES, INC., ET AL., DEFENDANTS/THIRD PARTY PLAINTIFFS,
v.
RCA CORPORATION, ET AL., THIRD PARTY DEFENDANTS.
Superior Court of New Jersey, Chancery Division, General Equity-Middlesex County.
Decided May 3, 1991.
*481 William D. Grand for plaintiffs (Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, attorneys).
*482 Mary F. Platt for plaintiffs-intervenors (Montgomery, McCracken, Walker & Rhoads, attorneys).
BACHMAN, P.J. Ch.
The matter presently before the court came by way of a motion for summary judgement by intervenor, Camden Properties, Inc. ("CPI"), to dismiss cross-claims made by plaintiffs, Russell-Stanley Corp. and Russell-Stanley West, Inc. (two related corporate entities, collectively known as "Russell-Stanley"). These cross-claims, which were recently asserted in plaintiffs' fifth amended complaint, are the following common-law causes of action:
(1) strict liability  second count of the fifth amended complaint;
(2) failure to warn  third count of the fifth amended complaint;
(3) negligence  fourth count of the fifth amended complaint;
(4) misrepresentation  fifth count of the fifth amended complaint; and
(5) unjust enrichment  sixth count of the fifth amended complaint.
Russell-Stanley, in turn, has made a cross-motion for summary judgement against intervenor CPI to impose liability for the costs incurred by Russell-Stanley in effecting a clean-up program based upon the theories that:
(A) a landlord is strictly liable for costs incurred when a government ordered clean-up occurs of a site contaminated by a tenant;
(B) CPI, as a matter of New Jersey law, is strictly liable as an owner of property at the time when its tenant discharged hazardous substances onto the site; and
(C) an unjust enrichment would occur if the court were to rule otherwise since CPI, as the owner of the polluted site, would then be the ultimate beneficiary of the government ordered clean-up.
This action, like many stemming from the Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K-6 et seq., and the Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A-1 et seq., arises from a complicated set of facts. On December 14, 1970, the RCA Corporation[1] transferred a commercial site *483 located at River Road and State Street in Camden, New Jersey to CPI, the present owner. On February 15, 1974, CPI leased the site to Advanced Chemical Technology ("ACT"), a subsidiary of Plant Industries, Inc. ("Plant"). Until the January 12, 1984 asset sale of its business to Russell-Stanley, ACT operated a plastic container and drum manufacturing facility at this site. During the course of these operations, based upon the current evidence of contamination on the site, it is alleged that ACT polluted the parcel through the release of lubricants and coolants from the machines it engaged in its manufacturing processes.
When Russell-Stanley acquired ACT's business through the 1984 asset purchase, the parties also entered into an "Assignment and Assumption of Lease" agreement. Under this agreement, Russell-Stanley assumed all of ACT's obligations under the lease with CPI. CPI consented to the assignment of the lease under the proviso that Plant remain secondarily liable in the event that Russell-Stanley should fail to perform any of its obligations under the lease. Also at this time, ACT and Russell-Stanley entered into an "Environmental Clean-up Responsibility Act Escrow" agreement, whereby ACT agreed to comply with any liabilities imposed upon the business transfer by ECRA. Under this agreement, ACT and Russell-Stanley deposited $50,000 into an escrow account for the purpose of funding any required cleanup. In addition, with the escrow agreement, ACT acknowledged its responsibility to comply with the provisions of ECRA.
Russell-Stanley's purchase of ACT's plastic container and drum business caused the provisions of ECRA, N.J.S.A. Sec. 13:1K-6 et seq., to be invoked. As such, ACT informed the New Jersey Department of Environmental Protection ("NJDEP") of the transaction and the appropriate activities *484 were begun to ensure that the property was free from contamination pursuant to the statute. As a result of the inspection process that ensued, NJDEP determined that a level of contamination existed beyond that anticipated by any of the parties. Additionally, by NJDEP order, Russell-Stanley was held responsible for the cleanup. Russell-Stanley currently estimates that the clean up will cost $461,622.
Plant and ACT refused to take any of the steps necessary to clean up the site pursuant to NJDEP's ECRA order. In fact, in the summer 1987, Plant and ACT filed for protection under federal bankruptcy laws. Also, in April 1986, Russell-Stanley had $700,000 in proceeds owed to ACT on two promissory notes from the asset sale escrowed for the purpose of funding the cleanup. The financing of this cleanup became even further complicated by the fact that ACT had assigned the proceeds of these promissory notes to Commercial Credit Corporation, which ultimately assigned the proceeds to Marine Midland Business Loans, Inc. ("Marine Midland"). In October 1986, Marine Midland began its own collateral lawsuit against Russell-Stanley in federal court regarding these funds. Russell-Stanley and Marine Midland settled this separate litigation in December 1987, with Russell-Stanley agreeing to remit $582,425.66 to Marine Midland. The remaining $166,154.11 in escrow funds were then used to fund the testing and clean-up of the site.
In the course of this six-year litigation, as more facts were learned from discovery and from site testing, the pleadings in this matter have been repeatedly amended. Of significance with regard to the matter currently before the court is a motion heard by the court on February 16, 1990, which resulted in an order dated March 5, 1990. In that motion, CPI moved, by way of summary judgement, to have claims asserted by Russell-Stanley dismissed. Russell-Stanley was asserting claims against CPI based upon the theory that private rights of action existed under ECRA and ERA. Specifically, Russell-Stanley was seeking injunctive relief, under ERA, to compel CPI to *485 cleanup the site, pursuant to ECRA. In dismissing Russell-Stanley's claim based on this private right of action theory, the court ruled that, pursuant to the Appellate Division's opinion in Superior Air Prod v. NL Industries, 216 N.J. Super. 46, 522 A.2d 1025 (App.Div. 1986), no statutory private right of action existed under the facts of this case since the provisions of ECRA had been properly triggered by and imposed upon Russell-Stanley. Therefore, as the DEP had acted, all that was left was for Russell-Stanley to cleanup the property and then pursue contribution in the form of monetary damages from the other parties that might have contaminated the site. As a result of this ruling, Russell-Stanley was given leave to amend its pleadings to add the common-law causes of action, which are now the subject matter of these proceedings.
It is CPI's argument that it should be granted summary judgement dismissing these newly amended common-law cross claims on the grounds that there is no legal or factual basis for them as was required in the court's March 5, 1990 order. In addition, CPI argues that Russell-Stanley, by virtue of its status as ACT's successor, is liable for any contamination caused by ACT on the property and, therefore, cannot pursue a cause of action against CPI for damages resulting from the ACT's conduct. Finally, CPI has also asserted the argument that it cannot be held liable, under principles of landlord-tenant contract law, for any possible claim Russell-Stanley might make for unjust enrichment.
Russell-Stanley, with its cross-motion for summary judgement, opposes the dismissal of the common-law causes of action from its fifth amended complaint by asserting that, as landlord, CPI is responsible for the cleanup costs of all contamination on its property not caused by Russell-Stanley based upon the common-law theories of strict liability and landlord-tenant law. In addition, Russell-Stanley asserts that CPI should be found liable based upon notions of unjust enrichment.
*486 What the court finds to be of great significance, at least with regard to its consideration of these cross-motions for summary judgement, is one of the exhibits submitted by Russell-Stanley in support of its motion. The exhibit in question was a portion of the transcript from an April 1989 deposition of an employee of CPI who functioned in the capacity of a property or site manager for the Russell-Stanley Camden plant. This individual stated that he or some other employee would inspect the site, usually on a weekly basis for CPI. This individual testified that this practice had been going on since at least 1971. The purpose of these inspections was to be sure of the maintenance of certain items  such as the roof, sprinkler systems and other building components  and to make sure that the tenants (ACT or Russell-Stanley) were keeping up with their obligations with regard to the lease. Obviously, statements such as these cause substantive questions to be raised regarding CPI's role in the administration and management of the subject site. For example, questions exist as to the exact nature of CPI's role as a landlord; were they actively or passively involved in the management of the property? Also, under the lease, did they still maintain exclusive rights as to the administration of the land, or were they precluded from any involvement by virtue of their agreement[2]?
Ultimately, as suggested by this court with both the hearing of oral argument on the February 16, 1990 motion (in which the Russell-Stanley's ERA and ECRA claims were dismissed), and the January 25, 1991 hearing of oral argument on this particular matter, the court would be called upon to construe the Supreme Court of New Jersey's opinion in State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983) to determine whether a subsequent tenant can bring a *487 common law cause of action for contribution against a landlord who owned a site when it was polluted by a previous tenant. The court finds the question of whether a subsequent tenant can hold a landlord liable for the cleanup of a site contaminated by a former tenant to be one of first impression. Therefore, before dealing with the particulars of each common-law claim brought against CPI by Russell-Stanley, the court must first determine the merits of such common-law causes of action against a landlord.
Before more fully addressing these issues, the court must stress the fact that the matter before it is that of cross-motions for summary judgement. This situation is in marked contrast to that which was before the Supreme Court of New Jersey in Ventron. Specifically, Ventron was a case which had been initially ruled upon after 55 days of trial. Thus, the Supreme Court had before it a factual record that was fully developed. In contrast, this court in now called upon to rule regarding pretrial cross-motions for summary judgement. Obviously, although extensive discovery has occurred, this court does not have the advantage of a complete and fully developed record. In addition, it should be noted that, as this is a ruling on cross-motions for summary judgement, the standard of judgement is that of whether a genuine issue of material fact exists and, if not, then whether the movant is entitled to judgement as a matter of law. R. 4:46-2 and Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74, 110 A.2d 24 (1954).

I.
In Ventron, a case dealing with the mercury pollution of a 40-acre tract surrounding Berry's Creek, which flows into the Hackensack River, the Supreme Court of New Jersey held that corporations involved in the pollution of a particular site were liable under various common-law principles. Various chemical corporations owned this site throughout the years, and contributed to the mercury pollution with their manufacturing activities. Significantly, the Berry's Creek site was owned by Velsicol *488 Chemical Corporation ("Velsicol"), a company which owned the site during most of the 1960's, and Ventron Corporation ("Ventron"), which owned the site from 1968 to about 1974[3]. In 1972, Ventron had a study conducted of the site and, in terms that were most clear and specific, knew of the mercury pollution. Also during this early 1970's time period, the mercury pollution had come to the attention of the United States Environmental Protection Agency ("EPA"). In 1974, Robert and Rita Wolf, real estate developers, purchased the site from Ventron. The Wolf's knew that mercury manufacturing had been conducted on the site. They did not, however, know that the site was contaminated, or they at least were not informed by Ventron of the results of its 1972 private study. Id. 94 N.J. at 483-485, 468 A.2d 150. NJDEP brought its action in 1976, naming Velsicol, Ventron, Wood Ridge[4] and the Wolfs.
In its decision in Ventron, the Supreme Court specifically noted that in Berg v. Reaction Motors Div., Thiokol Chem. Corp., 37 N.J. 396, 181 A.2d 487 (1962)[5], it had "adopted the proposition that `an ultrahazardous activity which introduces an unusual danger into the community ... should pay its own way in the event it actually causes damage to others.'" Id. 94 N.J. *489 at 487, 468 A.2d 150. In imposing liability in Berg, the court embraced the tests of the Restatement, Torts, §§ 519-520 (1938). As pointed out in Ventron, the "ultrahazardous" standard of Berg has since been replaced by the "abnormally dangerous" activities test of Restatement, Torts 2d, § 520, comments (d) and (e) (1977). In effect, this "abnormally dangerous" activities test is that of Rylands v. Fletcher, L.R. 1 Ex. 265 (1866), aff'd, L.R. 3 H.L. 330 (1868). Justice Pollock, in the Court's opinion in Ventron, then went on to state that the time had come:
to recognize expressly that the law of liability ha[d] evolved so that a landowner is strictly liable to others for harm caused by toxic wastes stored on his property and flow onto the property of others. Therefore, we overrule Marshall v. Wellwood and adopt the principle of liability originally declared in Rylands v. Fletcher. The net result is that those who use, or permit others to use, land for the conduct of abnormally dangerous activities are strictly liable for resultant damages. [94 N.J. at 488, 468 A.2d 150][6]
A further reading of Justice Pollock's opinion in Ventron suggests that, although the holding is clearly predicated upon Rylands v. Fletcher  the case which is generally accepted as having been the one which promulgated the notion of strict liability  it also clearly provides for common-law causes of action against landowners that pollute a given site. 94 N.J. at 488-491, 468 A.2d 150. Specifically, Justice Pollock discussed how the English common-law doctrines of nuisance and negligence gave rise to the doctrine of strict liability as to ultrahazardous activities. Thus, if strict liability is an acceptable claim *490 under Ventron, then it follows that other common-law claims would also be acceptable as they would then, in essence, be precursor causes of action. This approach finds support when viewed from the perspective that the court in Ventron was compelled to rely heavily upon Rylands v. Fletcher since it was overruling the Marshall v. Welwood decision and, in fact, establishing Rylands v. Fletcher as authority for the rule of strict liability in New Jersey. 94 N.J. at 488, 468 A.2d 150. Finally, one must realize that the Spill Compensation and Control Act (the "Spill Act") had been asserted as the primary theory for liability in Ventron. This act provided for remedies beyond that of the more traditional common-law causes of action. Id. at 493, 468 A.2d 150. Thus, by virtue of the assertion of spill act claims, it was axiomatic that traditional common law claims were applicable to Ventron. Therefore, it follows that, in addition to holding landowners strictly liable for contaminating a site, Ventron also stands for the proposition that such landowners may be held liable under more traditional common-law doctrines.
Finally, it should be noted that, although the lower court finding that the Wolfs were not liable for polluting the Berry Creek site was not included in the petition for certification before the Supreme Court of New Jersey in Ventron, the Supreme Court did uphold that ruling in its discussion by stating that "Berk and Wood Ridge, not Mr. and Mrs. Wolf, polluted the environment. During their ownership, the Wolfs have not continued to dump mercury and they have been responsible for only a minimal aggravation of the underlying hazardous condition." Ibid. In addition, the court, citing Restatement, Torts 2d, §§ 519-520, comment h at 39[7], wrote *491 "`the unavoidable risk of harm that is inherent in [disposing of toxic waste] requires that it be carried on at [the peril of one engaged in it], rather than at the expense of the innocent person who suffers harm as a result of it.'" 94 N.J. at 493, 468 A.2d 150.
The Supreme Court's opinion in Ventron has been construed in several other cases. In Kenney v. Scientific, Inc., 204 N.J. Super. 228, 497 A.2d 1310 (Law Div. 1985), a complicated case involving governmental and private entities regarding a landfill, the court found that claims for strict liability and negligence did exist. Specifically, residents living in the vicinity of landfills at which allegedly hazardous waste had been disposed brought a damage action against the state, owners and operators of the landfills, private and municipal generators of the waste, and the haulers of the waste. Despite ruling that the governmental entities were immune from liability, the court, on ruling on motions for summary judgement brought by various defendants, found (A) that the private generators of the waste were potentially absolutely liable, (B) that the public entity generators of waste could not be absolutely or vicariously liable, but could be liable for negligent choice of independent contractor, and (C) that the haulers of the waste could not be found strictly liable, but could be found liable for negligence in choosing a dangerous landfill and in delivering the waste.
*492 In discussing Ventron, the court in Kenney noted that the Supreme Court had "retained the doctrine of absolute liability, although substituting the description `abnormally dangerous' for `ultra-hazardous.'" Kenney, 204 N.J. Super. at 246, 497 A.2d 1310 (citing Ventron, 94 N.J. at 491, 468 A.2d 150). The court in Kenney, in finding that the private generators were potentially absolutely liable, then went on to note that when the Supreme Court fixed absolute liability in Ventron, it had expressed dissatisfaction with the "inherently dangerous" test which sparks vicarious liability for negligence. In discussing the difficulties posed by the "inherently dangerous" standard, the Ventron Court referred to the "difficulty of determining whether an activity is `ultra-hazardous' or `inherently dangerous'." Ventron, 94 N.J. at 491, 468 A.2d 150.
The court in Kenney then discussed how the Supreme Court, citing Restatement, Torts 2d, comment h at 39, went on to conclude in Ventron "`that ... toxic wastes are "abnormally dangerous," and the disposal of them ... is an abnormally dangerous activity ... the unavoidable risk ... inherent in it requires that it be carried on at [the polluters] peril, rather than at the expense of the innocent person who suffers harm as a result of it.'" Kenney, 204 N.J. Super. at 247, 497 A.2d 1310 (citing Ventron, 94 N.J. at 493, 468 A.2d 150). The court in Kenney took note of the significance of this conclusion from Ventron, especially the fact that it characterized the "disposal" of toxic wastes as abnormally dangerous. Ibid.
The Kenney court then went on to state that:
Since the potential for calamity lurking in an abnormally dangerous substance is precisely what justifies the imposition of absolute liability, the place where the substance ultimately does its marauding should not serve to dissipate such liability. A company which creates the Frankenstein monster of abnormally dangerous waste should not expect to be relieved of accountability for the depredations of its creature merely because the company entrusts the monster's care to another, even an independent contractor.
Furthermore, an important argument in support of strict or absolute liability is that despite the economic hardship involved, the creators of abnormally dangerous substances are far better able than the victims to sustain the costs of the injuries resulting from those substances. See Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 205 [447 A.2d 539] (1982) ... "[i]t should be a cost of doing business that in the course of doing that business an unreasonable risk *493 was created." Keeton, "Products Liability  Inadequacy of Information," 48 Tex.L.Rev. 398, 408 (1970). [Id. at 248, 497 A.2d 1310]
Thus, the Kenney court, in finding that the private generators of the landfill waste were potentially absolutely liable, clearly emphasized that, with regard to hazardous waste, the innocent person should not be harmed. Instead, those that received a benefit, be it economic or otherwise, from the abnormally dangerous activity should be held accountable.
The Kenney court also dealt with the question of whether the generators of the waste could also be found liable in tort under the theory of common-law negligence.
Although this court has concluded that there is absolute liability on the part of the generators concerning disposal of toxic waste, it will, nevertheless, deal with plaintiffs' further assertions of negligence on the part of the generators. The court believes it should consider negligence because plaintiffs seek punitive damages which "are not to be applied in the ordinary unaggravated tort case whether it be grounded on strict liability or fault." Berg v. Reaction Motors Div., 37 N.J. 396 [181 A.2d 487] (1962). In order to obtain punitive damages, a plaintiff must show "that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Id. at 414 [181 A.2d 487]. Although the test for imposition of punitive damages is severe, such damages may be awarded against a defendant who displays "such a conscious and deliberate disregard of the rights of others that his conduct may be called willful or wanton." Prosser & Keeton, Torts (5 ed. 1984), § 2 at 9-10. [Id. 204 N.J. Super. at 253, 497 A.2d 1310]
Thus, the Kenney court, in hearing these motions for summary judgement, found that a generator of waste could be held liable under theories of both strict liability and negligence. In making this finding, it is interesting to note that the court wrote that "[i]t is a settled rule of law that one may be liable for his negligent choice of an independent contractor." Id. at 253-254, 497 A.2d 1310 (citing Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 431, 153 A.2d 321 (1959)).[8] Thus, *494 the Kenney court found that, at least with respect to subcontractors and their principals, that vicarious liability did exist with respect to environmental claims under traditional notions regarding inherently dangerous activities.
Another case in which the Supreme Court's opinion in Ventron has been construed is Prospect Industries Corp. v. Singer Co., 238 N.J. Super. 394, 569 A.2d 908 (Law Div. 1989). In this case, plaintiff, the purchaser of the subject site, brought action against defendant vendor of the property to recover for contamination by PCBs. The facts of this case involved Singer's former Bridgewater, New Jersey plant. The property became contaminated with PCBs due to the spilling of hydraulic fluids from Singer's casting machines throughout much of the 20th Century. Prospect, without knowing of the contamination, purchased the site from Singer in 1977. In the matter actually before the court, Prospect was seeking a partial summary judgement, arguing that Singer was strictly liable as it had conducted abnormally dangerous activities at the subject Bridgewater plant. Singer countered this allegation by arguing that it had not engaged in an abnormally dangerous activity because it did not "dispose" of a toxic waste as defendants had in Ventron, but instead, had only consumptively used hydraulic fluids in its manufacturing process not knowing at the time that these liquids contained toxic substances. Singer also argued that the issue of strict liability cannot be decided on a *495 motion for summary judgement because it requires a fact-sensitive analysis of all the relevant circumstances under the Restatement, Torts 2d, § 520 (1977). Finally, Singer argued that they were not strictly liable to Prospect because Prospect essentially purchased the property "as is." Prospect, 238 N.J. Super. at 396-397, 569 A.2d 908.
The Superior Court, Law Division, in finding Singer liable, ruled that: (1) Singer's failure to control leakage of hydraulic fluids from machinery constituted a disposal of toxic materials for purposes of the rule imposing strict liability on the handling of toxic materials; (2) strict liability applied between successive landowners; and (3) the fact that the purchaser essentially agreed to take the property "as is" did not preclude the liability of the vendor.
In reaching this decision, the Prospect court noted that the Supreme Court, in Ventron, had broadly concluded that "[t]hose who poison the land must pay for its cure." Prospect at 398, 569 A.2d 908. Additionally, the court in Prospect wrote:
This court disagrees with this part of the holding in Amland [Properties Corp. v. Aluminum Co. of America, 711 F. Supp. 784] [(D.N.J. 1989)] and holds that there is no need to examine the Restatement factors, because, as this court understands the holding in Ventron, it is that, as a matter of New Jersey law, the handling of a substance containing toxic wastes is an abnormally dangerous activity even if it is not known by defendant the substance contains toxic wastes. This interpretation of the holding in Ventron is supported by the decision of T & E Industries, Inc. v. Safety Light Corp., 227 N.J. Super. 228 [546 A.2d 570] (App.Div. 1988), certif. granted, 117 N.J. 118, 119 [564 A.2d 848] (1989).... While T & E, Kenney and Ventron all involved the direct disposal or dumping of toxic wastes this court regards the holding in Ventron as so broad as to encompass contamination resulting from leakage of a substance containing toxic waste during a manufacturing operation, especially where it is undisputed that the contaminant has spread to the soil and ground water outside the building. Strong public policy considerations support this view.... As stated by the Court in Ventron, "those who poison the land must pay for its cure." 94 N.J. at 493 [468 A.2d 150]. [238 N.J. Super. at 400-401, 569 A.2d 908]
The Prospect court also addressed Singer's argument that the holding in Ventron is applicable only when actions on a defendant's property interferes with the rights of a neighbor, and that the Ventron decision is inapplicable between a prior *496 owner and successor in title of the contaminated property. The court in Prospect responded to this argument by noting that in T & E Industries Inc. v. Safety Light Corp., 227 N.J. Super. 228, 546 A.2d 570 (App.Div. 1988), aff'd 123 N.J. 371, 587 A.2d 1249 (1991), it was held that the doctrine of caveat emptor is not a defense to an absolute liability claim by a purchaser against a prior landowner[9]. Prospect, 238 N.J. Super. at 402, 569 A.2d 908. In addition, the Prospect court also addressed Singer's argument that T & E Industries's holding was inapplicable as the contract for sale between Prospect and Singer provided that Prospect had essentially agreed to take the property "as is." The court responded to this argument by stating that "there is no evidence that Prospect knew of the invisible PCB contamination either at the time it entered into the contract or even when it took title. Under such circumstances, the court held that the doctrine of caveat emptor is not a defense to a strict liability claim by a purchaser against a prior owner. Id. at 403, 569 A.2d 908.
Another case which relied heavily upon the Supreme Court of New Jersey's decision in Ventron is Tree Realty, Inc. v. Depart. of Treasury, 205 N.J. Super. 346, 500 A.2d 1075 (App. Div. 1985). Plaintiff-appellant in this matter had originally submitted a claim to the spill compensation fund under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., for *497 damages caused by the discharge of hazardous substances upon its land. The party which had discharged the hazardous substances was or had been plaintiff-appellant's lessee. The fund denied the claim and refused to settle the matter or submit it for arbitration. The fund's thesis was that as plaintiff-appellant was the owner of the property, it was also responsible for the discharge. Therefore, the fund argued that plaintiff-appellant was precluded from making a claim against the fund.
The Appellate Division, in a per curiam decision which affirmed the fund's position, held that the lessor was responsible as the owner of the property for all cleanup and removal costs, without regard to fault. The Appellate Division noted that "[d]ischargers are not the only ones liable for DEP's cleanup and removal costs." Tree Realty, Inc., 205 N.J. Super. at 348, 500 A.2d 1075. Specifically, the court noted that N.J.S.A. 58:10-23.11g.c states:
Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to subsection b. of section 7 of this act shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs. [Emphasis supplied]
In addition, the Appellate Division noted that in Ventron, the Supreme Court had "held that the above quoted words, `in any way responsible' include any owners or controllers of the property at the time of the unlawful discharge." Tree Realty, Inc. at 348, 500 A.2d 1075. Thus, the court held that plaintiff-appellant was responsible for the costs of the cleanup. It is interesting to note that the Appellate Division also took notice of the fact that the NJDEP, if it had chosen, could have performed the cleanup itself and then recovered the costs from plaintiff-appellant  instead of ordering them to do the cleanup, as, in fact, had been done  under the relevant statutes. Id. at 348, 500 A.2d 1075.
The Supreme Court's decision in Ventron clearly provides that, in addition to strict-liability claims, other common-law *498 causes of action may be asserted against persons and entities that contaminate a site. This conclusion is supported by the fact that the Ventron decision, as noted in Kenney, 204 N.J. Super. at 246-247, 497 A.2d 1310, substituted the phrase "abnormally dangerous" for "ultra-hazardous" regarding strict liability, and defined contamination by toxic wastes as an "abnormally dangerous" activity. Ventron, 94 N.J. at 493, 468 A.2d 150. As discussed in Kenney at 246-250, 497 A.2d 1310, it was clearly the intent of the Ventron opinion that a polluter only do so at his own peril  not at the peril of innocents. 94 N.J. at 493, 468 A.2d 150. This is especially so when the polluter has economically profited or benefitted from such pollution. Kenney, 204 N.J. Super. at 248, 497 A.2d 1310. Such would exist in the case of a landlord who actively administrated or managed a site leased to an entity that polluted.
As pointed out by the Kenney court, with its reliance on the Supreme Court's decision in Majestic Realty Associates, Inc. v. Toti Contracting Co., supra,[10] forms of vicarious liability do exist for toxic torts. See Kenney, 204 N.J. Super. at 249, 497 A.2d 1310. Such reasoning is also applicable to situations warranting strict liability. Ventron, 94 N.J. at 490-491, 468 A.2d 150. Obviously, the change to an "abnormally dangerous" activity standard for strict liability in Ventron greatly impacts the imposition of any possible applicable standards of vicarious liability in a toxic tort matter.
The Appellate Division, in Tree Realty, Inc., clearly recognized these arguments when it held that a lessor of a site was liable for the costs of cleaning up a tenant's toxic wastes. Relying on Ventron, the Appellate Division noted that pursuant to the relevant statute, a party "`in any way responsible,' include[s] any owners or controllers of the property at the time of the unlawful discharge." Tree Realty, Inc., 205 N.J. Super. at 348, 500 A.2d 1075. Therefore, CPI's argument, relative to *499 the Wolf's in Ventron, that Russell-Stanley's common law claims against it must be dismissed on the theory that CPI did not pollute the site, must be rejected. In Ventron, the Wolfs were found not liable because the Berry Creek site contamination occurred prior to their ownership, and it incurred no additional pollution while owned by the Wolfs. The record before the court in the present matter shows that the Camden site was obviously polluted by ACT while owned by CPI. In addition, Russell-Stanley has brought to the court's attention deposition testimony, from what appears to be a CPI employee, which indicates that CPI actively administered the leasehold. This management of the subject Camden site by CPI may even have included weekly inspections by a site manager. Under circumstances such as these, it is clear that, under Tree Realty, Inc., CPI is potentially liable under a variety of common-law theories.
In addition to CPI being potentially liable under the Appellate Division's ruling in Tree Realty, Inc., the court also takes notice of the fact that the NJDEP could have ordered CPI to clean up the Camden site as readily as it had ordered Russell-Stanley. Specifically, under the applicable ECRA statutes, N.J.S.A. 13:1K-8 and -9, as an owner of the site, CPI could have been ordered by NJDEP to clean-up the property on the theory that it was the owner of an industrial establishment. This, of course, is the same reasoning used by NJDEP to hold Tree Realty, Inc. liable for the clean-up in that case under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq. Paradoxically, with the matter currently before it, the court finds itself with a situation in which the NJDEP could have held CPI liable under the statute, yet CPI is arguing that the case law will not allow this court to do so. When one, however, considers the breadth of the Supreme Court's opinion in Ventron with regard to affixing liability for contamination by toxic waste, and the clear public policy considerations embodied in ECRA and ERA  the recognition that contamination of the environment is abnormally dangerous and that the public need *500 is so great that we must "clean-up first and affix liability later[11]"  it would be both counterintuitive and inequitable under the facts currently before the court to grant CPI's motion for summary judgement dismissing Russell-Stanley's common-law claims against it purely as a matter of law.
In relying upon Tree Realty, Inc., to deny CPI's motion for summary judgement, the court is aware of the fact that this matter, although similar, is clearly distinguishable. In Tree Realty, Inc., the Appellate Division was dealing with a challenge against the NJDEP by a landlord who had been ordered to cleanup a site. In that case, the landlord was seeking to submit a claim to the spill compensation fund. The landlord based this claim on the argument that it was not liable for the cleanup as it was not the party that polluted the site. The Tree Realty, Inc. opinion, however, can be read to have denied this claim on the theory that, as landowner, although Tree Realty, Inc. may not have been liable for the contamination, it was nonetheless responsible for the sites clean-up under the relevant statute.
In the matter currently before the court, we have a situation in which a lessee, who is also the successor in interest to the entity that appears to have been the primary polluter, is effectively seeking contribution from a landlord toward the costs of a NJDEP ordered cleanup. The landlord may or may not be liable for the contamination of that site. As discussed above, despite the fact that the NJDEP did not find CPI responsible for the clean-up, a substantial question exists as to the nature and extent of this landlord's liability under a variety of common-law theories. Therefore, at least with regard to the legal questions that exist regarding the distinctions between strict liability as to the statutory responsibility for cleaning up a contaminated site, and other common-law causes of action that may or may not exist relative to the actual liability *501 amongst the parties for contaminating a site, Russell-Stanley's cross-motions for summary judgement must be denied.
Finally, with regard to the issues presented by these cross-motions for summary judgement relative to the Ventron line of cases, the court has been presented with the overriding question of what theory of vicarious or joint enterprise liability is appropriate and equitable for determining if CPI is responsible to Russell-Stanley for the costs of the NJDEP ordered clean up. Bearing in mind the Supreme Court's heed for caution regarding having its opinions overread, T & E Industries, Inc. v. Safety Light Corporation, 123 N.J. at 400, 587 A.2d 1249, the court is also cognizant of the fact that, like Dixon Venture v. Joseph Dixon Crucible, 122 N.J. 228, 233, 584 A.2d 797 (1991), this situation is one in which the parties may not have been fully appreciative of the effects of ECRA as it involved a transaction which took place shortly after the statute's effective date. In addition, as the Supreme Court has stated in both T & E and Dixon Venture, "that almost without exception any conveyance of industrial property today would be made not in a vacuum but in full appreciation of regulatory requirements that would surely embrace a conditions such as [this] one...." T & E Industries, Inc., 123 N.J. at 401, 587 A.2d 1249, see also Dixon Venture, 122 N.J. at 232, 584 A.2d 797, the court believes that this matter also presents a unique set of circumstances. Therefore, although such cases as Ventron and Tree Realty, Inc. stand for the notion that strict liability is the rule for affixing liability in environmental contamination cases, Kenney, with its reliance on Majestic Realty[12], demonstrates that, depending upon the circumstances, other theories of liability may also be applicable. Clearly, this question is appropriate to affixing liability in a situation such as this, where the two principal litigants are a landlord that may have actively administered and managed the subject site while it was being contaminated, *502 and a subsequent tenant that made provisions for ECRA cleanup activities with the polluter when it became a successor in interest[13].

II.
Irrespective of the overriding question of whether a subsequent tenant can hold a landlord liable for the cleanup of a site contaminated by a former tenant, the underlying issues presented by each of the common-law claims raised by Russell-Stanley in its fifth amended complaint may nonetheless also be addressed, at least in terms of whether they may be factually germane to a final resolution of this matter relative to the record currently before the court. These five causes of action will be addressed in the order previously presented.

A. Strict Liability.

It is CPI's argument that Russell-Stanley is solely liable for ACT's pollution as it is ACT's corporate successor. Specifically, CPI argues that Russell-Stanley acquired ACT's assets and continued its manufacturing operations, the activities which caused the contamination. In addition, CPI asserts that Russell-Stanley cannot allege a strict-liability claim against CPI as Russell-Stanley does not own the land and as there is no evidence that CPI contributed to the contamination of the property. As discussed above, these arguments by CPI seem to be based upon the notion that its position is equivalent to that of the Wolfs' in Ventron. Again, as discussed above, such *503 a comparison must be rejected. The record currently before the court indicates that CPI may or may not have actively managed the Camden site during ACT's tenancy. This situation is completely different from that of the Wolfs' in Ventron, parties that purchased the Berry's Creek site well after the mercury contamination by industrial polluters had occurred.
CPI also appears to be asserting these arguments based upon the doctrines of caveat emptor and successor liability. CPI is asserting that Russell-Stanley is not entitled to hold it liable since, under the theory of caveat emptor, it knew or should have known of the potential liability when it purchased ACT's business. As discussed above, in light of the various decisions in such cases as T & E Industries Inc. v. Safety Light Corp. and Prospect Industries Corp. v. Singer Co., the defense of caveat emptor must be rejected.
With regard to CPI's proffer of the successor liability defense, this too must be rejected. As properly pointed out by Russell-Stanley, the leading authorities on the doctrine of successor liability in New Jersey are McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 561, 264 A.2d 98 (Law Div. 1970), aff'd on other grounds 118 N.J. Super. 480, 288 A.2d 585 (App.Div. 1972), and N.J. Transportation Dep't. v. PSC Resources, Inc., 175 N.J. Super. 447, 419 A.2d 1151 (Law Div. 1980). In McKee, it was established that the general rule of successor nonliability was not applicable in any one of four situations: (1) where the purchaser, either expressly or impliedly, agrees to assume the debts of the predecessor entity; (2) where the substance of the subject transaction is that of either a consolidation or a merger; (3) where the purchasing corporation is a mere continuation of the predecessor entity; and (4) where the subject transaction is a fraudulent endeavor entered into for the purpose of evading liability. McKee, 109 N.J. Super. at 561, 264 A.2d 98. The circumstances of Russell-Stanley's acquisition of ACT's business present the court with a situation in which successor *504 liability is alleged under the theory that the purchasing corporation is a continuation of the seller entity.
The Law Division elaborated upon the circumstances in which successor liability might occur in it's opinion to PSC Resources. Relying on Judge Pindar's opinion in Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 192-196, 241 A.2d 471 (Law Div. 1968), the PSC Resources court noted that when successor liability is argued based upon the allegation that the purchasing corporation is a mere continuation of the predecessor entity, such factors as less than adequate consideration, common directorships or management, and whether the transaction rendered the predecessor entity incapable of satisfying its liabilities should be considered. PSC Resources, 175 N.J. Super. at 455, 419 A.2d 1151. With regard to the Camden site that is the subject of this matter, in addition to the fact that none of these prerequisite elements to successor liability have been established, Russell-Stanley points out that it did not continue the operations of ACT since, pursuant to ECRA, it ceased to engage in the abnormally dangerous activity of improperly disposing of its toxic wastes. Clearly, questions of whether Russell-Stanley is continuing ACT's business, and whether the transfer was one which satisfies the various criteria for nullifying the general rule of successor nonliability do exist. Therefore, with regard to the question of strict liability, neither parties' motion for summary judgement can be granted.

B. Failure To Warn.

In its fifth amended complaint, Russell-Stanley alleges a count based upon CPI's failure to warn of the toxic wastes which contaminated the site. As correctly pointed out by CPI, such a claim is clearly contrary to the facts in this matter. Two specific instances clearly come to the court's attention when considering this claim. First is the fact that Russell-Stanley did not enter into a any contractual relationship with CPI, it only contracted to acquire ACT's business from Plant. Commensurate with this business acquisition, Russell-Stanley was *505 assigned ACT's lease with CPI. Second, Russell-Stanley was obviously aware of the fact that the subject site was contaminated as it saw the necessity of entering into an escrow arrangement with ACT to fund any cleanup that might be required under ECRA. Clearly, under these facts, Russell-Stanley was most certainly noticed of at least the risk that it was acquiring a contaminated site.
As properly pointed out by CPI, the property which is the subject of this matter is commercial, not residential. Therefore, no warranty of habitability is implied in such a lease contract. Van Ness Industries, Inc. v. Claremont Painting & Decorating Company, 129 N.J. Super. 507, 324 A.2d 102 (Ch. Div. 1974). In addition, the fact that Russell-Stanley continues to conduct the very business operations that it purchased from ACT on the site belies any assertion that the property is not fit for the purpose for which it was leased. Thus, as there was no lease or other contractual agreement between CPI and Russell-Stanley in which CPI made any assertion regarding the fitness of the subject Camden site, it is clear that CPI was under no express or implied legal obligation to warn Russell-Stanley. Finally, as discussed above, the facts clearly indicate that Russell-Stanley was aware of the risk that it might be acquiring a contaminated site[14]. Therefore, as there is no factual basis for the assertion of this claim by Russell-Stanley, summary judgment dismissing this court shall be granted in favor of CPI.

*506 C. Negligence.

Russell-Stanley's fifth amended complaint alleges a claim of negligence against CPI. CPI counters by arguing that it had no duty of care toward Russell-Stanley and, additionally, that this claim is completely unfounded as CPI clearly did not pollute the site. In short, CPI asserts that it cannot be held liable merely on some theory that, as landlord, it allowed ACT to contaminate the site.
Russell-Stanley, however, has done more than merely allege negligence. Significantly, by virtue of the deposition transcript of the CPI employee who was a site manager of the subject property, it is clear that CPI may have actively administered this site during ACT's tenancy. As such, the question of whether CPI negligently administered the Camden property, or negligently supervised those that inspected the site is clearly before the court.
CPI, argues that it should be granted summary judgment dismissing this count of the fifth amended complaint as it owed no duty of care to Russell-Stanley. Interestingly, the cases which CPI cites as authority for this proposition, Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 393, 189 A.2d 7 (1963) and McClafferty v. Tide Water Assocs. Oil Co., 2 N.J. Super. 626, 631, 65 A.2d 652 (Law Div. 1948), do not specifically stand for this point. In fact, a reading of the relevant portions of these authorities would seem to indicate that if a landlord were to exhibit a certain level of control over a site, then it would be proper to impose a duty on that landlord with respect to negligence. McClafferty at 631, 65 A.2d 652. In addition, as noted by the Law Division in Kenney, supra, when it discussed the question of punitive damages, "a plaintiff must show `that there has been a deliberate act of omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.'" 204 N.J.Super at 253, 497 A.2d 1310 (citing Berg v. Reaction Motors Div., supra, 37 N.J. at 414, 181 A.2d 487.) Finally, pursuant to the Supreme Court's *507 opinion in T & E Industries, Inc. v. Safety Light Corporation, a multifaceted situation involving the consideration of a variety of factors may intertwine notions of strict liability and negligence. 123 N.J. at 393-394, 587 A.2d 1249.
Clearly, the record currently before the court indicates that a factual question exists as to the level and nature of CPI's control over the Camden site during ACT's occupancy. From this, the question then follows as to whether a duty would arise through this conduct and be imposed upon CPI with respect to Russell-Stanley, under either a theory of negligence, negligent supervision or both. As questions of both fact and law exist regarding this count of the fifth amended complaint, the court cannot grant CPI's motion for summary judgement with respect to this issue.

D. Misrepresentation.

In its fifth amended complaint, Russell-Stanley raises the claim of misrepresentation. CPI, however, points out that it never made any representations to Russell-Stanley. In fact, all relevant negotiations regarding the transactions that resulted in Russell-Stanley's current responsibility for the cleanup of the Camden site appear to have been exclusively between Russell-Stanley and ACT or Plant. All that CPI appears to have done is agree to the assignment of the lease to Russell-Stanley.
Russell-Stanley appears to be endeavoring to formulate an argument that CPI's "passive approval" of the assignment rises to the level of misrepresentation. Under relevant New Jersey case law, more than this is required to successfully assert a claim for either fraudulent of negligent misrepresentation. Rieder Communities, Inc. v. Twp. of North Brunswick, 227 N.J. Super. 214, 227, 546 A.2d 563 (App. Div. 1988). In Jewish Center of Sussex County v. Whale, 86 N.J. 619, 432 A.2d 521 (1981), our Supreme Court identified the elements of a claim for misrepresentation as follows:

*508 a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. [at 624, 432 A.2d 521]
In addition, in order for such an allegation to be actionable, plaintiff must establish that the incorrect statement was justifiably relied upon. Rosenblum v. Alder, 93 N.J. 324, 334, 461 A.2d 138 (1983). Clearly, not only has Russell-Stanley failed to establish that CPI made an incorrect statement[15], Russell-Stanley has also failed to establish that even if any such statement were made by CPI, that it relied upon it. Finally, any claim by Russell-Stanley that it relied upon a misrepresentation made by CPI, either active or passive, seems completely untenable when one considers that Russell-Stanley and ACT entered into an escrow arrangement to fund any ECRA based clean-up. Therefore, as there are no controverted facts regarding this issue, and as it is clear that Russell-Stanley did not rely on any misrepresentation made by CPI regarding the contamination of the site, summary judgment must be granted to CPI with regard to this count of the fifth amended complaint.

E. Unjust Enrichment.

Finally, Russell-Stanley, in its fifth amended complaint, raises a claim based upon the equitable doctrine of unjust enrichment. CPI, in support of its motion for summary judgment, argues that a claim of unjust enrichment is equivalent to one based upon quasi-contract or implied contract. St. Paul Fire & Marine Insurance Co. v. Indemnity Ins. Co. of North America, 32 N.J. 17, 158 A.2d 825 (1960). Therefore, in this particular case, CPI argues that an application of the doctrine of quasi-contract precludes Russell-Stanley's unjust enrichment claim. Specifically, CPI points out that, a quasi-contractual *509 obligation will be imposed so as to bring about justice under the theory that "a person shall not be allowed to enrich himself unjustly at the expense of another, and ... whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do." Id. at 22, 158 A.2d 825. In order to accomplish this "[c]ourts employ the fiction of quasi or constructive contract with caution." Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108, 219 A.2d 332 (App.Div. 1966). CPI then points out that a prerequisite to an implied contract claim for unjust enrichment is that there is no express contract concerning the same matter. Moser v. Milner Hotels, Inc., 6 N.J. 278, 78 A.2d 393 (1951).
Based upon these authorities, CPI asserts that it is not liable under the theories of quasi-contract and unjust enrichment as (A) it did not know of the pollution until the NJDEP reported on the contamination after Russell-Stanley took possession of the site, (B) since privity of contract existed between ACT and Russell-Stanley  not CPI and Russell-Stanley  thus a contract not involving CPI exists with regard to this matter, and (C) Russell-Stanley has purportedly agreed to cleanup the site. Based upon the facts currently before the court, and the court's own reading of the various authorities cited, summary judgment cannot be granted based upon such a tenuous argument.
First, with regard to the facts, the questions raised by the possibility of a CPI site inspector's regular visits to the Camden property casts doubts upon the assertion that CPI knew nothing of the then ongoing contamination. In addition, the fact that a contract existed between ACT and Russell-Stanley may or may not be relevant as the scope of the site contamination was clearly beyond that which had been contemplated by any of the parties. In short, it is quite probable that there was never a contract between any of the parties with regard to the scope of the cleanup that was ordered by the NJDEP. Finally, it does not seem just to deem compliance with an ECRA based cleanup *510 plan, entered into under the auspices of a state administrative agency, to be the same as a voluntary agreement amongst parties.
Finally, as argued by Russell-Stanley, a finding of unjust enrichment involves a two part test: plaintiff must show both that defendant received a benefit, and that the retention of that benefit without payment would be unjust. Callano, 91 N.J. Super. at 109, 219 A.2d 332. CPI has and will benefit from the cleanup of the site. The question of whether the retention of this benefit without payment is unjust, particularly when weighed against such economic issues as Russell-Stanley's acquisition of ACT's business and the remaining lease term, remains outstanding. As such, summary judgment for either party cannot be made with regard to this count of the fifth amended complaint based upon the record currently before the court.
In summary, the record currently before the court shows that no questions of fact or law exist with regard to the claims in Russell-Stanley's fifth amended complaint based upon theories of either failure to warn or misrepresentation. Therefore, CPI is entitled to summary judgment with respect to these counts. With regard to the claims based upon strict liability, negligence and unjust enrichment, the cross-motions for summary judgment are denied.
NOTES
[1] At present, the RCA Corporation and other previous owners in the site's chain of title are parties to this litigation. For the purposes of the matter presently before the court, that of cross motions between plaintiff and intervenor, the fact of these additional defendants is of no relevance.
[2] The court also finds the fact that CPI owns several industrial parcels in the vicinity immediately surrounding the Russell-Stanley Camden site to be of significance. In fact, the NJDEP has deemed Russell-Stanley responsible for cleaning up property which is common to all of these parcels.
[3] In actuality, the Wood Ridge Chemical Corporation ("Wood Ridge") was the manufacturer that had polluted the Berry's Creek site. Wood Ridge was a corporate subsidiary of Velsicol, and was sold to Ventron in 1968.
[4] See note 3 supra.
[5] Berg v. Reaction Motors Div., Thiokol Chem. Corp., was a case involving the 1958 and 1959 testing, by an independent governmental contractor, of the engine for the United State's Air Force's supersonic rocket plane, known as the X-15. The rocket blasts from the tests of these engines caused ammonia fumes and extensive noise. The noxious effects from the testing of the rocket engines were clearly discernable to the residents of the neighboring Lake Telemark area of Rockaway Township. In fact, as a result of the vibrations emitted from the military testing, structural damage occurred to several houses in the area. 37 N.J. at 403-404, 181 A.2d 487. The initial complaint in this matter set fourth causes of action based in negligence, nuisance and trespass. Id. at 403, 181 A.2d 487. The Supreme Court of New Jersey held that defendant was liable for compensatory damages, but not punitive damages. Id. at 419, 181 A.2d 487.
[6] In the Ventron opinion, the Court stated that "[w]e believe it is time to recognize expressly that the law of liability has evolved so that a landowner is strictly liable to others for harm caused by toxic wastes ... [t]herefore, we overrule Marshall v. Welwood and adopt the principle of liability originally declared in Rylands v. Fletcher." Ibid. Although the Supreme Court of New Jersey's opinion in Ventron indicates that the New Jersey Supreme Court's opinion in Marshall v. Welwood, 38 N.J.L. 339 (Sup.Ct. 1876), rejected the then new strict liability doctrine of Rylands v. Fletcher, it is interesting to note that the Marshall v. Welwood court actually wrote that "the rule [is] mainly applicable to a class of cases which ... [is] in a great degree, exceptional." 38 N.J.L. at 341. Thus, one possible reading of Marshall v. Wellwood is not that it rejected the doctrine of strict liability, but that it rejected Rylands v. Fletcher's application of it as a general rule. Obviously, in Ventron, the Supreme Court of New Jersey's adoption of the Restatement, Torts 2d, reformulation of the "ultrahazardous" standard to that of the "abnormally dangerous" standard was commensurate with its overruling of Marshall v. Welwood.
[7] In the Supreme Court's opinion in T & E Industries, Inc. v. Safety Light Corporation, 123 N.J. 371, 587 A.2d 1249 (1991), it once again noted that the six Restatement factors that should be considered in determining whether or not an activity is "abnormally dangerous" are:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(c) inappropriateness of the activity to the place where it is carries on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes. [Id. at 390-391, 587 A.2d 1249] (citations omitted).
In its discussion of these factors, the court noted that, in Ventron, it had wrote that an evaluation of whether or not an activity is an abnormally dangerous one should be done on a case-by-case basis, and not as a matter of law. Ibid. Obviously, in light of the court's discussion of a 1940's general store with an underground gas tank, id. at 401, 587 A.2d 1249, such an analysis is more appropriate to a residential or cottage industry setting, and not to a large manufacturing concern involving petrochemicals.
[8] Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 431, 153 A.2d 321 (1959) dealt with a situation in which the owner and tenant of a building, which had been damaged when an independent contractor demolishing a Patterson city parking authority structure caused a wall to collapse onto plaintiffs' building, brought a cause of action against the city. The Court held that evidence on the issue of whether the demolition was inherently dangerous so that the city would be liable if its contractor had been negligent, presented a jury question. In reaching this holding, the Court wrote that:

The problem must be approached with an awareness of the long-settled doctrine that ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance (as our cases put it), he is not liable for the negligent acts of the contractor in the performance of the contract. Certain exceptions have come to be accepted, i.e., (a) where the landowner retains control of the manner and means of the doing of the work which is the subject of the contract; or (b) where he engages an incompetent contractor; or (c) where, as noted in the statement of the general rule, the activity contracted for constitutes a nuisance per se. [Id. at 430-431, 153 A.2d 321; citations omitted].
Also see Eyrich v. Earl, 203 N.J. Super. 144, 148, 495 A.2d 1375 (App.Div. 1985), Miltz v. Borroughs-Shelving, a Div. of Lear., 203 N.J. Super. 451, 461, 497 A.2d 516 (App.Div. 1985), and Cassano v. Aschoff, 226 N.J. Super. 110, 113, 543 A.2d 973 (App.Div. 1988).
[9] The Supreme Court of New Jersey, in its recent opinion affirming the Appellate Division in T & E Industries, Inc. v. Safety Light Corporation, 123 N.J. 371, 587 A.2d 1249 (1991), wrote "[n]or are we satisfied that the doctrine of caveat emptor as developed in New Jersey should bar plaintiff's cause of action." Id., at 387, 587 A.2d 1249. In discussing the appropriateness and validity of "the erosion of the doctrine of caveat emptor," id. at 388, 587 A.2d 1249, the Court went on to write "that [the] rationale [for the erosion of the doctrine of caveat emptor] echoes the underlying policy of the abnormally-dangerous-activity doctrine: certain enterprises should bear the costs attributable to their activities." Id. at 389, 587 A.2d 1249. The court then went on to conclude "[a] real-estate contract that does not disclose the abnormally-dangerous condition or activity does not shield from liability the seller who created that condition or engaged in that activity." Id. at 390, 587 A.2d 1249.
[10] See note 8 supra.
[11] See N.J.S.A. 2A:35A-2, 13:1K-7 and -11(c).
[12] See note 8 supra.
[13] It is also plausible that situations might exist where it would be inappropriate to find a landowner liable to a successor in interest for the costs of an environmental cleanup. Looking to the situation in Berg by analogy, what if a landowner had leased a site to a defense contractor for the rocket-engine testing? Obviously, under these circumstances, where there might be active participation by the United States' military or national security interests requiring secrecy, a lessor would almost certainly be unable to administer or manage the site during the lease period to determine if the environment were being contaminated. Fortunately, that set of facts does not exist in this matter.
[14] It is interesting to note that in its fifth amended complaint, Russell-Stanley also asserts various claims against S-R Analytical, Inc., the company which had performed a preacquisition evaluation of the subject Camden site. As stated in Russell-Stanley's fifth amended complaint, S-R Analytical, Inc. was to determine the cost of the cleanup of the property so that the site might then be in compliance with ECRA and other relevant statutes. Russell-Stanley has brought causes of action against S-R Analytical, Inc. based upon theories of misrepresentation and negligence.
[15] As CPI has also pointed out, under R. 4:5-8(a), an allegation of misrepresentation or fraud must be stated with particularity. Obviously, Russell-Stanley's allegation of "passive misrepresentation" fails to meet the requirements of this rule,